# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**DOUGLAS J. CORBETT,**
**Plaintiff,**

**v.**

**Civil Action No. 1:04cv241**
**(Judge Keeley)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**
**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

### I. Procedural History

Plaintiff filed his current application for DIB on June 17, 1999 (R. 119-21). Plaintiff filed an application for SSI on December 10, 2001 (R. 1,220-221). Plaintiff alleged disability since May 1, 1995, due to a post traumatic stress syndrome disorder, left knee problems, and hearing impairment (R. 179, 1229). The state agency denied Plaintiff's applications initially and upon reconsideration (R. 97-100, 101-105, 1209-212, 1215-216). An administrative hearing was held on August 29, 2000, and an unfavorable decision was issued by the ALJ Frederick J. Graf on September 21, 2000 (R. 1045-056). Plaintiff's request for review of the ALJ's decision was granted

by the Appeals Council (R. 1061-064). The Appeals Council's order required the ALJ to evaluate the Plaintiff's subjective complaints; evaluate Plaintiff's mental impairments; further consider Plaintiff's residual functional capacity (RFC); and obtain vocational expert (VE) testimony (R. 1061-064). Upon remand, ALJ Harry H. Barr conducted an administrative hearing on June 16, 2003 (R. 1399-425). On July 8, 2003, ALJ O. Price Dodson issued an unfavorable decision finding Plaintiff was not precluded from performing the jobs identified by a VE, absent his abuse of drugs (R. 34-61; R. 60, Findings Numbered 13, 14, 15). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 12-17).

## II. Statement of Facts

Plaintiff was forty-one years old at the time of his onset of disability (R. 119). Plaintiff has a high school education and has past work experience as a school bus monitor, a truck driver, and laborer (R. 135). He is a veteran, having served in the United States Army from 1973-1975, but has no combat experience. He lost his last job as a school bus driver in 1995, due to a positive random drug test (R. 565).

Medical Evidence

On March 6, 1990, Plaintiff was evaluated by Joel Andrew Mason, M.D., for a June 24, 1999, high-pressure injection injury to his left calf muscle (R. 254). Dr. Mason opined Plaintiff had "convalesced nicely from his injury . . . and . . . there would be no permanent disability resulting from any injuries sustained at the time of that accident" (R. 255).

On February 20, 1991, Plaintiff was examined by Robert S. Neff, M.D., for a "severe twisting injury to [Plaintiff's] left knee." Dr. Neff's diagnosis was for torn anterior cruciate ligament, for which he prescribed a brace and exercise program. Dr. Neff referred Plaintiff to

2

Lawrence M. Shall, M.D., a specialist in knee ligament reconstruction medicine (R. 253).

Plaintiff was examined by Joel Andrew Mason, M.D. on March 4, 1991. Plaintiff elected at that time to have knee surgery (R. 252).

On August 10, 1991, Dr. Shall examined Plaintiff. Plaintiff had fluid "built up" in his knee. Dr. Shall aspirated the fluid (R. 251).

On August 13, 1992, Plaintiff presented to Dr. Shall with swelling of his knee. Dr. Shall diagnosed neuroma of the infrapatellar branch of the lesser saphenous nerve. He injected Plaintiff's knee with cortisone (R. 249). Dr. Shall opined Plaintiff had not reached maximum medical benefit (R. 250).

On January 18, 1993, Dr. Shall noted Plaintiff had undergone neuroma surgery and was "going to rehabilitation" (R. 248).

On April 29, 1993, Dr. Shall opined Plaintiff had achieved maximum medical benefit "short of a work hardening program" (R. 246).

On August 10, 1993, Sheldon L. Cohn, M.D., corresponded with Christopher Mann, of Liberty Mutual Insurance Company. He wrote Plaintiff was post ACL reconstruction and status post saphenous nerve resection and complained of knee swelling and pain. Dr. Cohn aspirated Plaintiff's knee and injected Lidocaine and Aristospan (R. 245).

On October 15, 1993, Plaintiff's knee was aspirated and injected with Aristospan by Curtis V. Spear, Jr., M.D. An x-ray read by Dr. Spear showed no significant joint narrowing (R. 244).

On June 6, 1994, Dr. Shall opined Plaintiff was at twenty percent permanent impairment of his left lower extremity due to several knee surgeries. Dr. Shall wrote Plaintiff qualified "for assistance and disability" (R. 243).

On August 17, 1994, Dr. Shall opined Plaintiff should be "vocationally trained for a sedentary job" (R. 242).

On May 15, 1995, an x-ray was taken of Plaintiff's abdomen. The impression was for sigmoid diverticulosis and no other diagnostic abnormalities (R. 241).

On May 22, 1995, Dr. Shall examined Plaintiff's knee. He observed no swelling and mild tenderness on the medial joint line. Plaintiff informed Dr. Shall he was "no better and really no worse that he was on April 10, 1995." Dr. Shall diagnosed "post anterior cruciate ligament reconstruction with some mild saphenous neuritis and some patellofemoral pain." Dr. Shall recommended Plaintiff continue with physical therapy and continue use of his home TENS unit. Dr. Shall noted Plaintiff continued to work as a bus driver (R. 239).

On August 15, 1995, Plaintiff was admitted to the Veterans Administration Medical Center in Hampton, Virginia, for depression (R. 304). He reported "thoughts of suicide" and was treated with occupational therapy, kinesiotherapy, Ativan, and Lorazepam (R. 292, 296, 300).

On August 31, 1995, Plaintiff was approved for residency in a Hampton VA domiciliary (R. 267). Plaintiff was released from the Hampton VAMC on September 1, 1995 with a diagnosis of alcohol and marijuana dependency and dysthymia. He was prescribed Piroxicam, Thiamine, and folic acid. His discharge note read Plaintiff was compliant and employable (R. 270).

On September 13, 1995, a Veterans Administration group screening for domiciliary admittance was completed. It was noted Plaintiff's global index of cognitive functioning, orientation, verbal comprehension, intellectual development, visual memory, spatial organization, visual motor integration, and concentration were within normal limits. Plaintiff's immediate memory span and retention of verbal material were mildly impaired (R. 431). Plaintiff was found

4

to have extreme subjective depressive feelings, moderate depression, marked brooding, extreme somatic complaints, moderate conflict with authority, extreme social alienation, marked hypersensitivity, extreme persecutory ideation, and extreme lack of ego mastery (R. 430). Plaintiff was found to be "high positive" for alcoholism and "marked" for post-traumatic stress disorder symptomatology (R. 426).

On September 25, 1995, Plaintiff was admitted to a four-week intensive outpatient substance abuse treatment program at Hampton VAMC (R. 636).

On September 26, 1995, Plaintiff was evaluated at Hampton VAMC and the following diagnoses were made: Axis I – alcohol and cannabis dependence; Axis II – no diagnosis; Axis III – "S/P surgeries on left knee with residual neuropathy in left leg," "S/P surgery on left ear for hole in ear drum," and right ear infection; Axis IV – unemployed and homeless as psychosocial stressors; and Axis V – GAF of seventy (current) and eighty (as highest level in past year) (R. 403).

On October 27, 1995, an x-ray was made of Plaintiff's left knee. The impression was for postoperative and mild degenerative changes (R. 628).

On November 29, 1995, Plaintiff underwent ear surgery for insertion of a tube in his ear drum (R. 327).

On January 17, 1996, Robert Sandstrom, M.P.A., an addiction therapist with the Veterans Administration, noted Plaintiff had graduated from "Aftercare" as he had "been an open and honest participant of all group sessions with a good record of attendance" (R. 588).

On January 21, 1996, a VA Physical Medicine Rehabilitation Progress Report read Plaintiff had successfully met the program's goals for his cannabis dependency and alcohol abuse (R. 586).

On January 23, 1996, Mary K. Sweeney, a clinical nurse specialist at Hampton VAMC,

noted Plaintiff was in early remission for his alcohol and cannabis dependency (R. 585).

On February 22, 1996, a rehabilitative progress report was completed of Plaintiff at Hampton VAMC. Plaintiff informed the evaluator he had lost his last job as a school bus driver in Norfolk City public schools due to a positive random drug test. The evaluator noted Plaintiff tended to "minimize his drug use and rationalizes the use of marijuana because it helped him sleep." Plaintiff reported to the evaluator he experienced PTSD due to a "voluntary homosexual experience while stationed in Germany with the Army" (R. 565). Plaintiff stated his knee injury and subsequent surgeries continued to cause pain and limitations. Plaintiff informed the evaluator he had accepted a settlement from Liberty Mutual Insurance Company for his knee injury, had applied for and been denied Social Security disability benefits, and intended to reapply for Social Security benefits and, if awarded benefits, work part time to supplement his Social Security income (R. 566).

Plaintiff stated his medical conditions included chronic ear pain related to fluid; chronic knee pain related to injury, surgery, and fluid; and migraine headaches. Plaintiff informed the evaluator his goals were to obtain "housing in the Warwick SRO"; be awarded Social Security benefits; work part time at the VAMC; and "get his head straight" (R. 566). Plaintiff reported a long history of marijuana abuse/dependence (R. 567). The evaluator's impression was for the following: Axis I – marijuana dependence, "ETOH dependence," and dysthymia; Axis II – deferred; Axis III – irritable bowel, chronic knee pain, chronic ear pain, migraine headaches; Axis IV – homeless and unemployed; and Axis V – GAF 60 (R. 568).

In the spring of 1996, Plaintiff enrolled in the Veterans Upward Bound Program for college preparatory in math and English. He was also enrolled in computer-keyboarding classes. On April 16, 1996, it was noted Plaintiff withdrew from those classes. As a result, Plaintiff was removed from the "VRT Evaluation Section roster" (R. 593).

On May 17, 1996, Judith Carey, LCSW, noted Plaintiff had "successfully completed all components of the ReHabitat Program and was accepted by the VASH-Hud program on 5/17/96," which was sponsored by the VA (R. 509). On that same date, Donald P. Smith, a VA psychology technician, and James Robinson, a VA staff psychologist, noted Plaintiff attempted to "stay in the DOM system" as he had spent his income in "repairing his automobile." Plaintiff stated he planned to "continue working his I.T. assignment, await his NSC claim and live in his automobile" (R. 507).

On June 3, 1996, Sreeja Kadakkal, M.D., completed a Psychiatric Review Technique of Plaintiff. Dr. Kadakkal found an RFC assessment was necessary and that Plaintiff had affective and substance addiction disorders (R. 463). Plaintiff's affective disorder was for dysthymia (R. 466). Plaintiff's did not meet a listing for his substance addiction disorders (R. 469). Dr. Kadakkal found Plaintiff had a slight degree of limitation of restriction of activities of daily living; moderate degree of limitation in maintaining social functioning; and seldom experienced limitations in concentration, persistence, or pace. Dr. Kadakkal found Plaintiff had experienced episodes of deterioration or decompensation once or twice. Dr. Kadakkal found Plaintiff had no functional limitation that manifested itself to a degree of limitation that satisfied a listing (R. 470).

Also on June 3, 1996, Dr. Kadakkal completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff to be "not significantly" limited in the following abilities: 1) remember locations and work-like procedures; 2) understand and remember short and simple instructions; 3) carry out very short and simple instructions; 4) maintain attention and concentration for extended periods; 5) perform activities within a schedule; 6) maintain regular attendance; 7) be punctual within customary tolerances; 8) sustain an ordinary routine without special supervision; 9) work in coordination with or proximity to others without being distracted;

10) make simple work-related decisions; 11) complete a normal workday and workweek without interruptions from psychologically based symptoms; 12) perform at a consistent pace without an unreasonable number and length of rest periods; 13) ask simple questions or request assistance; 14) accept instructions and respond appropriately to criticism from supervisors; 15) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 16) maintain socially appropriate behavior; 17) adhere to basic standards of neatness and cleanliness; 18) respond appropriately to changes in the work setting; 19) be aware of normal hazards and take appropriate precautions; 20) travel in unfamiliar places or use public transportation; and 21) set realistic goals or make plans independently of others (R. 472-73). Dr. Kadakkal found Plaintiff was moderately limited in the following abilities: 1) understand and remember detailed instructions; 2) carry out detailed instructions; and 3) interact appropriately with the general public (R. 472-73).

On June 4, 1996, Carolina B. Longa, M.D., completed a Residual Physical Functional Capacity Assessment of Plaintiff. She found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour work day, and unlimited push/pull (R. 466). Plaintiff was found to have no postural, manipulative, visual, communicative, or environmental limitations (R. 478-80).

On June 19, 1996, Plaintiff informed Keith M. Austin, LCSW, his VA social worker, that his lawyer had informed him he was "dropping his [Social Security] case because all Dr. statements indicate that he is able to work" (R. 501).

On July 18, 1996, Plaintiff was diagnosed with alcohol dependency, marijuana dependency, and dysthymia at Hampton VAMC. It was noted that Plaintiff had completed his placement in the

ReHabitat Program and the Substance Abuse Treatment Program, which was part of the Domiciliary Homeless Program (R. 485). Plaintiff was "competent for VA purposes," employable, and could undertake activity as tolerated. Plaintiff's medications were listed as Trazodone, Butalbital/Acetaminophen, and plain Tylenol (R. 487).

On August 15, 1996, Plaintiff began biofeedback treatment at Hampton VAMC (R. 747).

On September 23, 1996, Plaintiff was seen by Hampton VAMC psychologist Leonard Holmes, Ph.D. Plaintiff and Dr. Holmes discussed his continuous headaches and possible PTSD symptoms (R. 744).

On October 15, 1996, Plaintiff reported to his first session of the "Coping with Pain Group" at Hampton VAMC. Plaintiff "was an active participant" (R. 741). Also on this date, Plaintiff was seen by Dr. Holmes for biofeedback (R. 739).

On November 4, 1996, Plaintiff actively participated in the Hampton VAMC's "Coping with Pain Group" (R. 736).

On December 31, 1996, Plaintiff was seen by Dr. Holmes for biofeedback (R. 735).

On January 14, 1997, Plaintiff reported to Dr. Holmes that his pain was a "'7' on a scale of 1-10 most days," but that he had decreased his use of narcotics (R. 734).

On January 29, 1997, Plaintiff cancelled his biofeedback appointment as he had been involved in an automobile accident (R. 732).

A February 3, 1997, x-ray of Plaintiff's left knee indicated "changes of previous anterior cruciate ligament repair," but otherwise negative left knee (R. 690).

On February 10, 1997, Gerry N. Smith, M.D., completed a consultative examination of Plaintiff. Plaintiff's chief complaint was decreased salary and decreased ability to work. Plaintiff

9

also complained of poor vision and left knee pain. Plaintiff reported to Dr. Smith that he had undergone three knee surgeries, wore a brace when outside his home, and used a homes TENS unit (R. 687-88). Plaintiff appeared to be talkative, cooperative, alert, and oriented "X3." Dr. Smith observed "patchy decreased sensation to light touch over the medial surface of [Plaintiff's] left thigh," left knee, and proximal left calf region. Dr. Smith noted Plaintiff presented with mild atrophy distally of the left quadriceps muscles, 5/5 strength proximally and distally of the lower extremities, and 4/5 strength of left knee flexion and extension. Plaintiff had normal range of motion in his hips, ankles, and right knee. Plaintiff had full active range of motion in his left knee for flexion with "-5 degrees from full with left knee extension." Dr. Smith observed Plaintiff's gait had a mild impairment as it was mildly antalgic with decreased full and total weight on the left leg (R. 689). Plaintiff was able to "take steps up on his toes as well as back on his heels within normal limits" and hop on his left and right legs within normal limits. Dr. Smith's summary was that Plaintiff had status post left knee injury and surgeries and persistent discomfort and decreased functioning of his left knee; medial surface left leg sensory disturbance, hearing/audiologic dysfunction, history of alcohol and marijuana use, and dysthymic disorder (R. 689).

On February 25, 1997, Dr. Longa completed a Physical Residual Functional Capacity Assessment of Plaintiff. She found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and unlimited push/pull (R. 692). Dr. Longa found Plaintiff was limited to "frequently" climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling and was limited to "occasionally" climbing ladders, ropes, and scaffolds (R. 693). Plaintiff was found to have no manipulative, visual, communicative,

or environmental limitations (R. 694-95).

On February 26, 1997, Plaintiff was seen by Dr. Holmes for biofeedback. He reported he did not have any injuries or pain as a result of his automobile accident but that his headaches had increased (R. 731).

On March 5, 1997, Stonsa Insinna, Ph.D., completed a Psychiatric Review Technique. Dr. Insinna found a RFC assessment was necessary for Plaintiff and that Plaintiff had an Affective Disorder in the form of dysthymia and a Substance Addiction Disorder in the form of "alcohol & THC dependency/abuse in early remission" (R. 699, 705). Dr. Insinna found Plaintiff had a slight degree of limitation in maintaining social functioning and seldom demonstrated a degree of limitation in concentration, persistence or pace. Dr. Insinna found Plaintiff had experienced one or two episodes of deterioration or decompensation (R. 706).

Also on March 5, 1997, Dr. Insinna completed a Mental Residual Functional Capacity Assessment of Plaintiff. Plaintiff was found to be not significantly limited in the following abilities: 1) remember locations and work-like procedures; 2) understand and remember short and simple instructions; 3) carry out very short and simple instructions; 4) maintain attention and concentration for extended periods; 5) perform activities within a schedule; 6) maintain regular attendance; 7) be punctual within customary tolerances; 8) sustain an ordinary routine without special supervision; 9) work in coordination with or proximity to others without being distracted; 10) make simple work-related decisions; 11) complete a normal workday and workweek without interruptions from psychologically based symptoms; 12) perform at a consistent pace without an unreasonable number and length of rest periods; 13) ask simple questions or request assistance; 14) accept instructions and respond appropriately to criticism from supervisors; 15) get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; 16) maintain socially appropriate behavior; 17) adhere to basic standards of neatness and cleanliness; 18) respond appropriately to changes in the work setting; 19) be aware of normal hazards and take appropriate precautions; 20) travel in unfamiliar places or use public transportation; and 21) interact appropriately with the general public (R. 708-09). Dr. Insinna found Plaintiff was moderately limited in his ability to understand, carry out, and remember detailed instructions and ability to set realistic goals or make plans independently of others (R. 708-09).

On March 14, 1997, Dr. Holmes noted Plaintiff was being discharged from the Chronic Pain Program at Hampton VAMC (R. 730).

On March 27, 1997, Plaintiff reported to Dr. Holmes for biofeedback (R. 727).

On April 8, 1997, Plaintiff returned to his "Incentive Therapy Assignment," which was sponsored by the Hampton VAMC (R. 726).

On April 8, 1997, Plaintiff reported to Priscilla B. Hankins, M.D., of the Incentive Therapy Assignment group. He had been admitted to Incentive Therapy eight days earlier. He stated "he felt he could stop drug use on his own" and was counseled on the importance of doing so. Plaintiff admitted he had used marijuana for years and his last drug use was only two days earlier (R. 1189).

On May 6, 1997, Plaintiff underwent biofeedback with Dr. Holmes at the Hampton, Virginia, VAMC. He reported to Dr. Holmes that he was "hopeful about a new job he applied for recently" and he was "feeling calmer since beginning a new medication" (R. 724).

On May 22, 1997, Plaintiff reported to the VAMC Post Traumatic Stress Disorder Clinical Team for an evaluation of "PTSD-related complaints." Plaintiff reported to Marinell Miller, Ph.D. that he had been stationed in Germany. On this occasion Plaintiff reported that in either February

or March, 1975, a black male came into his room and began to "smooth talk" him and give him a drink. Plaintiff told the psychologist he "wonders if the drink was drugged as he thought he couldn't hear all the time and he felt drugged. The troop started to touch him and perform oral sex on him. The event lasted 45 minutes to one hour, and he did not yell out. He reported it to the Master Sgt. Who sent him to another officer. He reported he was being transferred for 'fear for your life.'"

Plaintiff informed Dr. Miller he experienced "onset of symptoms immediately after leaving the service." His symptoms included "re-experiencing through recurrent intrursive [sic] thoughts, nightmares, full sensory hallucinations, flashbacks and intense psychological distress upon exposure to trauma specific cues ("black males"); avoidance as demonstrated by efforts to avoid thoughts, feelings, or conversations of trauma, feelings of detachment, restricted affect, and a sense of foreshortened future; and increased "arousal manifested by difficulty falling asleep, irritable mood, decreased concentration, hypervigilance, and exaggerated startle response." Plaintiff asserted his symptoms had been "persistent for years and have caused significant detriment to social and vocational function" (R. 721).

Plaintiff reported he had a history of alcohol and cannabis abuse, but had "been clean" for five years from alcohol and planned to "stop smoking pot soon as he will need to return to work." Plaintiff reported he had held thirty-plus jobs since being discharged from the military and had changed jobs many times due to quitting or being fired. Plaintiff said he lived at a rooming house and worked as an "incentive therapy worker at the VA." Plaintiff's overall health was noted to be "fair" (R. 722).

Dr. Miller noted Plaintiff was cooperative and goal directed. Plaintiff's speech was logical and "thought processes were intact without evidence of psychosis." Dr. Miller observed Plaintiff's

13

thought content contained "intrusive thoughts of sexual and relationships [sic] matters." Plaintiff denied suicidal or homicidal ideation, plan, or intent. Plaintiff's mood was "non-depressed and anxious with mood congruent affect." Plaintiff's insight and judgment were intact (R. 722).

Dr. Miller diagnosed: Axis I – PTSD, chronic with impact on social and vocational function and polysubstance abuse; Axis II – none; Axis III – ENT difficulties and left knee problems; Axis IV – unemployed, chronic PTSD symptoms, and past trauma; and Axis V – GAF was 50 (current) (R. 722). Dr. Miller opined Plaintiff met "full criteria for PTSD and is recommended for enrollment in the PCT Clinic" (R. 722-23).

On May 31, 1997, Plaintiff was removed from the Incentive Therapy Program at Hampton VAMC because he tested positive for cannabinoids (R. 720).

On June 6, 1997, Plaintiff returned to Dr. Holmes for biofeedback. Dr. Holmes noted Plaintiff was "motivated to begin the PTSD program next week" (R. 719).

On July 31, 1997, Plaintiff returned Hampton VAMC for a biofeedback session. Plaintiff stated he had not had any headache pain in the past two weeks (R. 715).

On August 21, 1997, Plaintiff reported to Priscilla B. Hankins, M.D., at Hampton VAMC that he continued to have a positive therapeutic response to Paxil. Plaintiff informed Dr. Hankins he was less anxious, sleeping better, and did not "pace the floors." Plaintiff stated "keeping busy and attendance at the educational classes on PTSD help him as well." Plaintiff revealed no psychosis or suicidal or homicidal ideation. His insight and judgment were intact. Dr. Hankins prescribed Paxil to Plaintiff (R. 714).

On September 25, 1997, A. A. Douglas Moore, M.D., reviewed the February 25, 1997, Physical Residual Functional Capacity Assessment of Dr. Longa and affirmed same (R. 698).

14

On November 7, 1997, Plaintiff reported to Carlson M. Pendleton, a licensed clinical social worker at Hampton VAMC, that he had "not been able to track down the record of his rape. He presented about 8 letters he wrote to various agencies in an attempt to find the report he completed at the time of the incident. None of the government agencies were [sic] able to come up with the report. The [Plaintiff] thinks that perhaps it was destroyed rather than sent forward" (R. 1171-172).

On November 11, 1997, Plaintiff completed a thirteen-week PTSD Group Education Session at Hampton VAMC (R. 1171).

On June 10, 1998, an ear evaluation was conducted. Plaintiff was diagnosed with allergic rhinitis, for which he was prescribed Vancenase; chronic serous otitis media, for which he was prescribed amoxicillin; and tinnitus, for which he was instructed to cease his use of aspirin (R. 757).

On September 25, 1998, Plaintiff was examined by J. James Rooks, M.D., who diagnosed chronic eustachian tube dysfunction and bilateral high frequency sensory neural hearing loss. Plaintiff did not desire the insertion of "T tubes." Dr. Rooks opined Plaintiff had "done his best" to care for his ears as he had "stopped drinking . . . [and] does not smoke." Dr. Rooks ordered an evaluation in one year (R. 756).

On December 14, 1998, Plaintiff was screened for domiciliary acceptance. It was noted his rehabilitation potential and substance abuse status were questionable. It was decided that a "clarification of rehab potential and ATC assessment" would need to be made before deciding Plaintiff's appropriate level of required care (R. 755).

On December 23, 1998, Plaintiff reported to Robin A. Sutton, BSW for Addictions, that he had been in recovery for alcohol for the "last four years," but found his addiction to marijuana "not a major problem in his life. His last use was a few weeks ago." Plaintiff informed Ms. Sutton he

15

needed a hip replacement, and this need prevented him from acquiring employment. Plaintiff did not meet the "DSM-IV criteria for addiction treatment." Plaintiff was invited to attend weekly group therapy (R. 754).

On January 4, 1999, it was noted by Norman E. Wear, a Veterans Administration chaplain, that Plaintiff had been in the "DCHV outpatient clinic for three weeks" and had done well. Plaintiff was admitted to the domiciliary "pending bed availability" (R. 752).

On January 13, 1999, Plaintiff was admitted to a VAMC domiciliary in Portland, Oregon. It was noted Plaintiff had hearing loss and left knee pain, swelling and stiffness (R. 853, 854). Plaintiff stated he "last felt depressed in 96 when hospitalized" (R. 854). It was noted Plaintiff was symptomatic for depression and a history of intermittent dysthymia. Plaintiff was not taking any medications and had no cognitive impairments. Plaintiff's mood was stable, affect was appropriate, speech was appropriate, and behavior was appropriate. It was noted Plaintiff had a history of PTSD related to a "male rape in military" (R. 856). Plaintiff's treatment plan included "[p]articipation in DCHV," management of his medical problems, and laboratory tests. Plaintiff was medically cleared for "IT, . . . employment in the community, physical activities in 'DCHV,' . . . Recreational Therapy, Physical Fitness Training, Housekeeping Assignments" (R. 855).

On January 15, 1999, a chest x-ray showed no acute cardiopulmonary disease and lung changes that were consistent with a smoking history (R. 761).

On January 19, 1999, a Rehabilitation Care Plan was created for Plaintiff. The plan included goals for Plaintiff to obtain housing, generate income, save money, develop skills for interdependence, develop and maintain a substance abuse recovery program, improve mental health by addressing the symptoms of rage and isolation, and improve physical health (R. 846-48).

16

On January 21, 1999, Plaintiff was seen at the Addiction Treatment Center at the VAMC, in Portland, Oregon. It was noted Plaintiff appeared "to be motivted [sic] to change present living and coping patterns and continue substance free lifestyle and become a self-supporting and contributing member of community." He was diagnosed with: Axis I – alcohol dependence (full remission), cannabis dependence (early remission); Axis II – history of intermittent dysthymia and PTSD; Axis III – otitis media, tinnitis, and degenerative joint disease; Axis IV – problems related to homelessness, occupational problems, and economic problems; and Axis V – GAF 50 (R. 844).

On March 12, 1999, Plaintiff reported to Mark M. Abrams, a nurse practitioner at Portland VAMC, that he had "renewed symptoms of PTSD, including difficulty sleeping, nightmares, and constant thoughts about the previous trauma." Plaintiff stated "he would like to consider transfer to a PTSD in-patient treatment program at this time." He was instructed to confer with "the CRT" on March 15, 1999, for an evaluation and was prescribed Trazodone for sleeplessness (R. 810).

On March 17, 1999, Plaintiff reported to Nurse Practitioner Abrams he had been accepted into the PTSD program, which was scheduled to begin in three weeks. Plaintiff informed Nurse Practitioner Abrams that he slept "solidly all night" as a result of taking Trazodone (R. 810).

On March 30, 1999, Winston E. Johnson, a Health Technician at Portland VAMC, noted Plaintiff had reported he had started his daily PTSD group sessions and weekly substance abuse program (R. 800).

On April 21, 1999, Plaintiff was transferred from the domiciliary at Portland VAMC to a residual support unit (R. 792-93). On that date, Glenn Ehlig, Physician Assistant, evaluated Plaintiff and found the following: Axis I – anxiety disorder with PTSD symptoms, cannabis dependence (continuous in early remission), and alcohol dependence (full remission); Axis II – "R/O personality

17

disorder or features, NOS"; Axis III – chronic eustachian tube dysfunction, high-frequency sensori neural hearing loss, history of chronic otitis media, history of chronic tinnitus, status post left anterior cruciate ligament reconstruction, mild left knee degenerative arthritis, hyperlipidemia, and loss of T8-9 disk space; Axis IV – homelessness, unemployed, history of traumatic event while in military; and Axis V – GAF of 40 (R. 790).

An April 23, 1999 x-ray of Plaintiff's thoracic spine showed "almost complete loss of disk space at T9-10, congenital vs. acquired" (R. 760).

On May 7, 1999, Plaintiff was discharged from the residual support unit. He transferred to the White City Domiciliary, located in White City, Oregon (R. 780-82, 876-77).

On May 12, 1999, Gerald Otis, a staff psychologist at the White City VAMC, conducted an "Addiction Severity Index" interview of Plaintiff (R. 921). Plaintiff told Dr. Otis that he had never been treated for alcohol or drug abuse (R. 923). Plaintiff stated he had been "bothered considerably by psychological or emotional problems in the month prior to [the] interview" but that he considered "treatment for psychological or emotional problems to be not at all important" (R. 924). After this subjective interview, Dr. Otis found Plaintiff had medical problems with a severity of 7, psychiatric problems with a severity of 6, and zero severity of employment, alcohol, or drug problems.

During a mental health screening on May 12, 1999, conducted by a nurse at White City VAMC, Plaintiff reported his sleep had been restless during the past week and he felt hopeful about the future. Also on that date, Plaintiff, during a PTSD screening, reported he had been bothered by repeated, disturbing memories during the past month (R. 927).

On May 17, 1999, Plaintiff was evaluated by Dr. Otis (R. 871-75, 947-50). Plaintiff informed Dr. Otis he had a twelfth grade education. Plaintiff stated he was fired from his last

18

regular job as a bus driver because he tested positive for marijuana (R. 872). Plaintiff stated he began using marijuana at the age of ten and had tried cocaine "a few times, but had never used it regularly." Plaintiff informed Dr. Otis that he had "one 'suicide attempt,'" and that occurred when he was "applying to enter the Hampton VAMC . . . and . . . had learned from other veterans that one way to avoid getting turned down for admission was to report a suicide attempt." Plaintiff asserted he had been "raped" while stationed in Germany in 1975, and, as a result he continued to have nightmares (R. 873). Dr. Otis made the following diagnoses: Axis I – post-traumatic stress disorder and cannabis dependence; Axis II – features of histrionic personality disorder; Axis IV – psychosocial and environmental problems: homeless, low income, unemployed; and Axis V – GAF of forty-five (R. 874). Dr. Otis recommended Plaintiff be referred to Recreation Service, consult with a substance abuse counselor, and have his anxiety medications re-evaluated (R. 875).

On May 19, 1999, Plaintiff underwent a physical examination at the White City VAMC. Plaintiff reported a "history of chronic otitis bilateral with eustachian tube function and hearing loss . . .," "recent onset of dizziness and vertigo . . .," "[p]robable post traumatic arthritis, left knee . . .,"and "recent onset of pain posterior aspect of neck." Physical examination revealed normal head and neck, eyes, throat, mouth, chest, lungs, cardiovascular, abdomen, neurological, and skin (R. 931-32). Plaintiff's left ear contained a "PET tube" and his right ear was scarred. Septal deviation was noted in Plaintiff's left nostril (R. 931). A "cyst-like lesion" was "present inferior aspect of right testicle" and two hemorrhoids were observed. Plaintiff's back revealed "tenderness to palpation . . . over lumbosacral spine," but no tenderness, lordosis, kyphosis or scoliosis. Plaintiff had full range of motion of his back. The impressions were for the following: alcohol dependence (in remission), polysubstance dependence (primarily marijuana and continuous), homeless, PTSD

19

by history, bilateral chronic otitis media and eustachian tube, hearing loss by history, recent onset

of dizziness and vertigo, questionable sustained hypertension, post traumatic arthritis of left knee,

dental disease, symptomatic external hemorrhoids, diverticulosis by history, and recent onset of neck

pain (R. 932).

On June 8, 1999, a x-ray was made at White City VAMC of Plaintiff's thoracic spine because

of "recent onset of pain." It showed the T9-10 intevertebral bodies were congenitally fused and that

other disc space was well preserved (R. 934, 964). Also an x-ray of Plaintiff's left knee showed

"orthopedic hardware, screw fragments, in the tibia and femur;" "degenerative joint disease

involving the medial compartment of the knee;; and "synovial calcification" (R. 965).

On June 22, 1999, Plaintiff's ears were examined by Richard L. Swanson, M.D., at White

City VAMC. Dr. Swanson opined Plaintiff had chronic bilateral tubotympanitis in his right ear, for

which he prescribed Septra (R. 901).

On July 6, 1999, Plaintiff was seen by Lawrence B. Inderbitzen, M.D., at White City VAMC,

for PTSD medication regimen. Dr. Inderbitzen prescribed Paroxetine and discontinued Plaintiff's

prescription of Hydroxyzine (R. 900).

On July 6, 1999, Plaintiff returned to Dr. Swanson for examination of his right ear. Dr.

Swanson opined Plaintiff's "[r]ight serous otitis media [had] improved, but middle ear effusion

remains. CBT still present and functioning left ear." Dr. Swanson continued Plaintiff's prescription

of Septra and instructed Plaintiff to return in two weeks for a "right myringotomy and CBT

placement" (R. 900).

On July 20, 1999, Dr. Swanson performed a "myringotomy with aspiration and insertion of

CBT" on Plaintiff's right ear. Dr. Swanson continued Plaintiff's prescription for Septra and

prescribed Cortisporin Otic Suspension drops (R.  899).

William E.  Matthews, M.D., conducted an orthopedic consultative examination of Plaintiff on July 20, 1999.  Plaintiff stated he treated his knee with "careful activity, oral medication, bracing of the left knee, and some special exercises."  Plaintiff stated his symptoms included upper and lower back pain, bilateral buttock pain in his hips, pain in left thigh and lower leg, numbness in the lower left leg, left foot pain and numbness, left knee pain, and collapse of left knee (R.  898).  Dr. Matthews observed Plaintiff could "rise on the toes and heels" and flex forward and reach his feet. Dr.  Matthews diagnoses for Plaintiff's left knee were as follows:  joint arthritis, continued pain, collapsing, moderate loss of motion, neuroma, chronic synovitis, and posttraumatic degenerative arthritis.  Dr.  Matthews noted Plaintiff's ligament stability appeared to be satisfactory.  He also noted Plaintiff's left knee symptoms were "probably significantly worsened by chronic tension and/or depression" (R.  898).

On September 22, 1997, Dr.  Kadakkal completed a Psychiatric Review evaluation of Plaintiff.  Dr.  Kadakkal found an RFC assessment was necessary and Plaintiff was positive for anxiety related disorders and substance addiction disorders (R.  992).  Plaintiff's anxiety related disorder was in the form of chronic PTSD (R.  996).  Plaintiff was slightly limited in his activities of daily living, moderately limited in maintaining social functioning, and seldom limited in concentration, persistence, and pace.  Dr.  Kadakkal found Plaintiff had once or twice experienced episodes of deterioration or decompensation (R.  999).

Also on September 22, 1997, Dr.  Kadakkal completed a Mental Functional Capacity Assessment of Plaintiff.  He found the following abilities of Plaintiff to be not significantly limited: 1) remember locations and work-like procedures; 2) understand and remember short and simple

instructions; 3) carry out very short and simple instructions; 4) maintain attention and concentration for extended periods; 5) perform activities within a schedule; 6) maintain regular attendance; 7) be punctual within customary tolerances; 8) sustain an ordinary routine without special supervision; 9) work in coordination with or proximity to others without being distracted; 10) make simple work-related decisions; 11) complete a normal workday and workweek without interruptions from psychologically based symptoms; 12) perform at a consistent pace without an unreasonable number and length of rest periods; 13) ask simple questions or request assistance; 14) accept instructions and respond appropriately to criticism from supervisors; 15) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 16) maintain socially appropriate behavior; 17) adhere to basic standards of neatness and cleanliness; 18) respond appropriately to changes in the work setting; 19) be aware of normal hazards and take appropriate precautions; 20) travel in unfamiliar places or use public transportation; and 21) set realistic goals or make plans independently of others (R. 1001-002). Dr. Kadakkal found Plaintiff was moderately limited in the following abilities: 1) understand and remember detailed instructions; 2) carry out detailed instructions; and 3) interact appropriately with the general public (R. 1001-002).

On October 29, 1999, J. Scott Pritchard, D.O., completed a Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and unlimited push/pull (R. 1006). Dr. Pritchard found Plaintiff could frequently climb ramps and stairs and balance. He found Plaintiff could occasionally climb ladders, ropes, scaffolds; stoop; kneel; crouch; and crawl (R. 1007). Dr. Pritchard found Plaintiff had no manipulative, visual, communicative, or

environmental limitations (R. 1008-009). Dr. Pritchard noted he had reviewed Plaintiff's medical records in their entirely, that no listing was met, and there was "nothing further in file that would reduce or alter the RFC" (R. 1012).

Also on October 29, 1999, Bill Hennings, Ph.D., completed a Psychiatric Review Technique Form, finding an RFC assessment and a referral to another medical speciality was necessary to establish Plaintiff's medical disposition. Dr. Hennings found Plaintiff was positive for affective disorders, anxiety related disorders, and substance addiction disorders (R. 1013). Plaintiff's affective disorder was "depression NOS" (R. 1016). Plaintiff's anxiety disorder was listed as PTSD "by history" (R. 1017). Plaintiff's substance addiction disorder were for alcohol and cannabis dependence (in remission) and evaluated under Listings 12.04 and 12.06 (R. 1019). Dr. Hennings opined Plaintiff was slightly limited in his activities of daily living, moderately limited in maintaining social functioning, and was often limited in his concentration, persistence, or pace. Dr. Hennings noted there was insufficient evidence to conclude if Plaintiff had ever experienced episodes of deterioration or decompensation (R. 1020).

Dr. Hennings also completed a mental residual functional capacity assessment of Plaintiff. He found Plaintiff was not significantly limited in his ability to remember locations and work-like procedures, ability to understand and remember very short and simple instructions, ability to carry out very short and simple instructions, ability to perform activities within a schedule, ability to maintain regular attendance, ability to be punctual within customary tolerances, ability to sustain an ordinary routine without special supervision, ability to make simple work-related decisions, ability to complete a normal work day and workweek without interruptions, ability to perform at a consistent pace without an unreasonable number and length of rest periods, ability to ask simple

23

questions or request assistance, ability to accept instructions and respond appropriately to criticism from supervisors, ability to get along with coworkers or peers, ability to maintain socially appropriate behavior, ability to adhere to basic standards of neatness and cleanliness, ability to respond appropriately to changes in the work setting, ability to be aware of normal hazards and take appropriate precautions, and ability to travel in unfamiliar places. Dr. Hennings found Plaintiff was moderately limited in his ability to understand, remember, and carry out detained instructions; ability to maintain attention and concentration for extended periods of time; ability to work in coordination with or proximity to others without being distracted by them; ability to interact appropriately with the general public, and ability to set realistic goals or make plans independently (R. 1022-023).

On November 22, 1999, Dick Wimmers, Ph.D., reviewed Dr. Hennings's October 29, 1999, Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Plaintiff and affirmed his findings (R. 1013, 1024).

On November 23, 1999, Dr. L. Jenseum reviewed the October 29, 1999, report of Dr. Pritchard and affirmed same (R. 1012).

On June 6, 2000, psychologist Edwin E. Pearson, Ph.D., examined Plaintiff at the request of Mr. Harrison, Plaintiff's VA vocational counselor, in order to develop "appropriate educational and vocational goals" for Plaintiff (R. 1029). Plaintiff told Dr. Pearson:

> Toward the end of his enlistment, he reports that another Army man made sexual advances that he should not have allowed. This occurred on only one occasion. Douglas claims he was quite naive and, before he knew it, he was involved in sexual activities that were unfamiliar and disturbing. The very next day he reported the incident to his superiors. He was transferred to another base, and from his perspective nothing really came of it. Douglas would like to have seen the man punished. In any event, the incident was unsettling for Douglas, and to this day he has many unresolved feelings around that experience.

(R. 1030). Dr. Pearson administered a battery of tests including the Wechsler Adult Intelligence

Scale, Wechsler Memory Scale, Wide Range Achievement Test, Gates-MacGintie Reading Tests, and the Minnesota Multiphasic Personality Inventory. He also conducted a one and one-half hour diagnostic interview. Dr. Pearson diagnosed: Axis I – chronic post-traumatic stress syndrome, pain disorder associated with psychological factors, and history of alcohol and cannabis dependence in full remission; Axis II – borderline intellectual functioning; Axis III – medical problems; Axis IV – psychosocial and environmental problems; and Axis V – GAF of sixty-five (R. 1034). Dr. Pearson opined that "[i]t would certainly be reasonable to assume that this individual will be able to return to some kind of competitive employment in the future, especially if he remains clean and sober (R. 1034).

On July 28, 2000, psychologist Otis reviewed psychologist Pearson's evaluation and opined:

> While Dr. Pearson believed Doug could be trained in some "hands-on" occupation, his back condition is likely to restrict the number of those competitive employment situations which would be available to him. Because of potential liability, employers tend to not want to take risks on individuals with back problems. It is conceivable there might be some employment niche which Doug can fill if allowances were made for his disabilities, but the chances of him finding one that would pay enough for him to live on are slight. It seems likely to me that the patient will need some kind of subsidy in order to remain viable in the community. I also disagree with Dr. Pearson's GAF estimate of 65. I had earlier (see Psychological Assessment shortly after patient entered the Domiciliary) given the patient a GAF rating of 45, and after seeing his test results, would shave a few point off that. The patient's willingness to work is admirable and efforts should be made to locate that rare niche he might fit into, but the likelihood of him being ale to survive in the community without assistance is nil, in my opinion.

(R. 1028).

An August 8, 2000, x-ray of Plaintiff's left knee showed "[d]egenerative change" in the form of chondromalasic changes, degenerative spurring, joint space narrowing, and calcification within the cartilaginous tissue (R. 1042).

On October 31, 2000, Dr. Otis completed a Mental Residual Functional Capacity finding

Plaintiff was not significantly limited in his ability to ask simple questions or request assistance. He found Plaintiff was moderately limited in the following abilities: 1) ability to remember locations and work-like procedures; 2) ability to understand and remember very short and simple instructions; 3) ability to carry out very short and simple instructions; 4) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 5) ability to interact appropriately with the general public; 6) ability to accept instructions and to respond appropriately to criticism from supervisors; 7) ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; 8) ability to be aware of normal hazards and take appropriate precautions; and 9) ability to travel in unfamiliar places or to use public transportation. Dr. Otis found Plaintiff to be markedly limited in the following abilities: 1) ability to understand and remember detailed instructions; 2) ability to carry out detailed instructions; 3) ability to maintain attention and concentration for extended periods; 4) ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; 5) ability to sustain an ordinary routine without special supervision; 6) ability to work in coordination with or proximity to others without being distracted by them; 7) ability to make simple work-related decisions; 8) ability to respond appropriately to changes in the work setting; and 9) ability to set realistic goals or to make plans independently of others (R. 1070-080). Dr. Otis opined Plaintiff's limitations lasted or were expected to last for twelve months. Dr. Otis noted the onset of Plaintiff's limitations was "3 yrs. ago" (R. 1081).

On January 3, 2001, Plaintiff reported to Portland VAMC, with left knee pain. Examination revealed a small effusion of Plaintiff's left knee, but no warmth, diaphoresis, or blotching. Diagnosis

was "chronic knee pain." Plaintiff was injected with Lidocine and Marcaine and was scheduled for a diagnostic arthroscopy (R. 1363).

A January 3, 2001, x-ray of Plaintiff's knees showed left knee degenerative changes, left patellofemoral joint degenerative change, postoperative left knee, and left knee joint effusion (R. 1360).

On January 30, 2001, Thomas Harrison, a vocational rehabilitation counselor with the Department of Veterans Affairs, in Portland, Oregon, wrote "[g]iven this veteran's work history, education, present level of academic functioning, impact of his service-connected and workers comp injuries, I believe that he would be hard pressed to compete for the vast majority of jobs in the local labor market in southern Oregon. He is precluded, in my opinion, from all employment that he has held previously given the physically demanding nature of these job descriptions. His academic abilities, presently, would make it difficult for him to compete for positions that are within his physical capacities. I also believe that this veteran would probably be hard pressed to work on a full time basis" (R. 1113).

On February 1, 2001, John B. Reid, III, M.D., performed a diagnostic arthroscopy of Plaintiff's left knee. Dr. Reid observed "three compartment end stage osteoarthritis with intact anterior cruciate ligament" of Plaintiff's left knee (R. 1350-351).

On May 7, 2001, Plaintiff reported to John Jackson, M.D., for his hearing and knee problem. Plaintiff stated he experienced pain in his ears and head and vertigo. Plaintiff informed Dr. Jackson the Veterans Administration provided a hearing aid to him. Plaintiff stated he experienced pain in his left knee. He reported he had "asked the doctors to just cut his leg off as it's giving him so much difficulty." Plaintiff stated he experienced lower thoracic back pain. Dr. Jackson's examination of

Plaintiff's ears revealed scarred tympanic membranes and no significant wax. Dr. Jackson's examination of Plaintiff's leg revealed knee pain with simple range of motion. Dr. Jackson diagnosed the following: hearing loss, tinnitus, vertigo, post-traumatic arthritis of the left knee, mid-thoracic back pain due to "missing disc" (by Plaintiff's report), and PTSD. Dr. Jackson referred Plaintiff to an orthopedist and an ears-nose-throat doctor. Plaintiff asked Dr. Jackson about medicating his conditions with "medical marijuana," and Dr. Jackson "declined to consider prescribing it under [Plaintiff's] circumstances." Dr. Jackson prescribed Paxil (R. 1308).

On June 7, 2001, Plaintiff presented to Sean Traynor, M.D., with complaints of bilateral hearing loss and ear disease. Plaintiff informed Dr. Traynor he experienced hearing loss and he attributed his hearing loss to "significant noise exposure while in the military." Plaintiff stated the military noise was "frequent exposure to firearms as well as an event in which he was riding in a tank and an explosion occurred within a small area." Plaintiff informed Dr. Traynor that he was exposed to significant noise exposure when he worked in the railroad industry. Plaintiff reported his having "required two sets of PE tubes" but denied chronic ear infection. Plaintiff also reported dizziness, but his "history, with regards to the dizziness, is rather 'rambling'" Dr. Traynor noted. Plaintiff reported no fullness in ears, worsening of tinnitus, headaches, visual changes, weakness, or paresthesias (R. 1299).

Dr. Traynor observed both Plaintiff's ear canals were clear, his tympanic membranes were slightly dull and sluggish, and his tympanic membranes were intact without atelectasis. Dr. Traynor reviewed Plaintiff's audiogram. He noted it demonstrated "severe, symmetric, centrally flat sensorineural hearing loss with a possible small conductive component at the lower frequencies." Plaintiff's speech discrimination was one-hundred percent and his hearing level was "80 dB" (R.

1300). Dr. Traynor's assessment was for "long standing bilateral hearing loss." Dr. Traynor noted the main component to Plaintiff's hearing loss was "sensorineural and this is supported by both military and post military as likely contributing." Dr. Traynor opined Plaintiff's hearing loss was "likely contributing to [Plaintiff's] tinnitus." Dr. Traynor observed middle ear effusion and that Plaintiff has benefitted "in the past from PE tubes." Dr. Traynor noted Plaintiff did not have active, chronic, or acute infection of his ears. Dr. Traynor recommended the placement of "PE tubes" and intended to schedule the procedure "over the next couple weeks" (R. 1301).

On June 13, 2001, Richard E. James, M.D., of Southern Oregon Orthopedics, examined Plaintiff's left knee. Plaintiff was referred by Dr. Jackson. He observed Plaintiff experienced pain when he squatted; "0 to 110 degrees range of motion; 3- effusion of the knee; 4+ patellofemoral crepitus and patellofemoral pain with compression; 4+ mid and posteromedial joint line tenderness; 2+ mid and posterolateral joint line tenderness." Plaintiff had "pretty good anteroposterior stability." Dr. James diagnosed posttraumatic arthritis of the left knee. Dr. James advised Plaintiff that if he chose to have knee replacement surgery, he "would only keep him off work for the normal rehabilitation time following knee replacement." Dr. James scheduled Plaintiff for a "left total knee replacement" (R. 1093).

On June 20, 2001, Dr. Traynor performed a "bilateral myringotomy and tubes" on Plaintiff (R. 1298).

Dr. James conducted a pre-operation examination of Plaintiff on June 29, 2001 (R. 1091).

On July 3, 2001, Dr. James performed left knee replacement surgery on Plaintiff at Providence Medford Medical Center (R. 1083-84).

On July 6, 2001, Plaintiff was discharged from the hospital. The medical record read

Plaintiff's "left knee showed excellent position of his total knee replacement arthroplasty on x-ray." Plaintiff was instructed to attend outpatient physical therapy and return to Dr. James in ten to twelve days (R. 1083).

On July 16, 2001, Plaintiff presented to Dr. James for left knee replacement surgery follow-up. Plaintiff's passive motion was "10 to 90 degrees" and active motion was "15 to 80 degrees." Dr. James noted Plaintiff needed to "work hard on his quadriceps and hamstring progressive resistance exercises . . . as well as posterior capsular and hamstring stretching." Plaintiff was instructed to continue with physical therapy and return to Dr. James in four weeks (R. 1090).

On August 3, 2001, Plaintiff reported to Dr. Traynor that he had "good relief in his right ear fullness following placement of the PE tube but believe[d] . . . the fullness in his left ear has returned." Dr. Traynor's examination revealed both Plaintiff's ear canals were clear and right tympanic membrane was healthy. Dr. Traynor observed the left ear canal revealed inflammation and a protruding PE tube. Dr. Traynor prescribed Cortisporin drops for Plaintiff's ears (R. 1297).

On August 12, 2001, Dr. Traynor examined Plaintiff's ear. His right ear was normal; his left ear revealed erythema and edema around the external auditory canal and eardrum (R. 1295).

On August 17, 2001, Plaintiff reported to Dr. James that he was "doing fine following . . . left total knee replacement." Plaintiff's range of motion was "10 to 90 degrees." Plaintiff presented with no valgus/varus instability, no anterior/posterior stability, and a well-healed incision." The x-ray made on that date showed "excellent position of the total knee replacement . . . on all views." Plaintiff was instructed to continue physical therapy and return in two months to Dr. James (R. 1089).

On August 30, 2001, Plaintiff returned to Dr. Traynor with complaints of "perceived fullness

in his left ear." Plaintiff reported he experienced imbalance and occasional "popping of the left ear." Dr. Traynor observed Plaintiff's ear canals were clear. Plaintiff's left tympanic membrane was "mildly atelectatic." Dr. Traynor did not observe any middle or external ear infections (R. 1296).

On September 25, 2001, Dr. Traynor performed a left myringotomy and "T tube" placement of Plaintiff (R. 1294).

On October 12, 2001, Plaintiff presented to Dr. James and reported he was "happy with his result" of his knee replacement. Plaintiff's range of motion was "0 to 110 degrees" with no effusion. Excellent stability and alignment were noted. Dr. James noted Plaintiff was making good progress. He encouraged Plaintiff to continue physical therapy and exercise. Plaintiff requested a medication other than Lortab; Dr. James prescribed Darvocet and Vioxx (R. 1088).

On October 25, 2001, Plaintiff presented to Dr. Traynor with "relief of the fullness in the left ear after the T tube was placed." Plaintiff stated he continued feeling imbalanced. Dr. Traynor observed Plaintiff's ear canals were clear, tympanic membranes were healthy, and "patent tube bilaterally." Dr. Traynor diagnosed bilateral serous otitis media, which was resolved by tube placement, and disequilibrium. Dr. Traynor recommended a repeat electronystagmongram (R. 1293).

On November 12, 2001, Plaintiff presented to Jeffrey Rice, M.S., an audiologist with Dr. Traynor's office, with complaints of intermittent floating feeling, head pressure, tinnitus, and possible orthostatic hypotension. Mr. Rice noted Plaintiff's electronystagmongram was "noncontributory." Mr. Rice opined Plaintiff's symptoms may have been "due to high-frequency vestibular abnormality, other postural related systems (somatosensory or vision), or psychological issues (R. 1283).

On November 14, 2001, Plaintiff returned to Mr. Rice with complaints of intermittent floating feeling, head pressure, tinnitus and orthostatic hypotension. Audiological testing by Mr. Rice of Plaintiff revealed no abnormalities. Mr. Rice opined Plaintiff's symptoms could be caused by "high-frequency vestibular dysfunction, central vestibular abnormalities, postural related systems (somatosensory or vision), or psychological issues (R. 1282).

On January 11, 2002, Dr. Jackson corresponded to Kathleen Quick, of Medford Disability Services, relative to the administrative medical examination she performed on Plaintiff. Dr. Jackson recounted Plaintiff's "ACL replacement surgery," "total knee replacement" surgery, chronic dizziness, thoracic spine pain, and PTSD [Plaintiff's report] (R. 1035-036). Dr. Jackson's review of systems revealed no history of seizures, strokes, or chronic headaches. Plaintiff's only ears-nose-throat complaints were for dizziness, tinnitus, and difficulty hearing (R. 1037). Plaintiff's musculoskeletal examination revealed swelling at left knee, but no tenderness. Plaintiff's left knee full extension was about "160," and his flexion seemed to be near normal. Dr. Jackson's assessment was for the following: 1) "history of injury and subsequent to the left knee with left total knee replacement surgery performed six months ago"; 2) tinnitus, dizziness, hearing loss; 3) history of lower thoracic back pain and "a missing disk"; 4) and PTSD (R. 1307).

Dr. Jackson opined Plaintiff's left knee conditions were the "primary barrier to [his] returning to the type of work he previously did, which included working at the railroad, in a shipyard and construction work" (R. 1035) Dr. Jackson further opined Plaintiff's "balance difficulties and his orthopedic problems would preclude him from doing heavy physical work or work requiring agility and good balance. He should not work on ladders or at height. I see no contraindication to performing a sedentary job. His ongoing health problems involving his knees, ears and

32

psychological disorder are all under treatment at this time" (R. 1037).

On March 4, 2002, Plaintiff was examined by Dr. James, who noted Plaintiff was not performing "the other exercises he needs for his quadriceps." Plaintiff's straight leg test was positive and range of motion was "0 to 125 degrees passively, 0 to 15 degrees actively" (R. 1087).

On March 8, 2002, Dorothy Anderson, Ph.D., completed a Psychiatric Review Technique of Plaintiff. Dr. Anderson found Plaintiff had mental impairments that were not severe (R. 1310). His non-severe anxiety-related disorder was "a history of" PTSD (R. 1310, 1315). Dr. Anderson found Plaintiff was only mildly limited in his activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence or pace. Dr. Anderson found Plaintiff had not experienced any episodes of decompensation (R. 1320).

On March 9, 2002, Dick Wimmers, Ph.D., reviewed the findings contained in the March 8, 2002, Psychiatric Review Technique of Plaintiff by Dr. Anderson and affirmed those findings (R. 1310).

On March 11, 2002, Mary Ann Westfall, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Westfall found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of at least two hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and unlimited push/pull (R. 1325). Dr. Westfall found Plaintiff limited to "frequently" climbing ramps and stairs; "occasionally" balancing, stooping, crouching, and crawling; and should "never" climb ladders, ropes and scaffolds or kneel with his right knee (R. 1326). Dr. Westfall found Plaintiff had no manipulative, visual or communicative limitations (R. 1327-328). He should avoid concentrated exposure to hazards (R. 1328).

On March 20, 2002, Dr. James reported Plaintiff's March 7, 2002, MRI of his lumbar spine showed "far lateral protrusion of the L3-4 disk which extends into and narrows the L3-4 neural foramina on the right. He has mild, bilateral foraminal stenosis at L4-5 and a mild posterior disk bulge at L5-S1 with bilateral foraminal stenosis." Dr. James noted he would "call [Plaintiff] and try to get [an epidural steroid injection] set up (R. 1086).

On April 14, 2002, Plaintiff transferred to Hampton VAMC from White River VAMC (R. 1160). Plaintiff denied use of or having "a problem" with illicit drugs (R. 1162). Plaintiff, when asked if he experienced "sexual harrassment [sic] or trauma while in the military service," responded he had not (R. 1163-164). Plaintiff identified no barriers to his learning (R. 1164). Plaintiff was transferred to Emergent Care at Hampton VAMC by Linda C. Murray, R.N., for "chronic low back pain [that] initially began as a workman's comp injury 10 years ago" (R. 1165). Plaintiff reported he had been administered an epidural steroid injection for his low back pain and had realized no relief of his symptoms therefrom. Plaintiff stated he self medicated his PTSD symptoms (nightmares) by using marijuana. Plaintiff reported he had undergone no hospitalizations or procedures since he was last seen at Hampton VAMC (R. 1166). Plaintiff appeared to be oriented and in no distress, his "external auditory canal [was] clear bilaterally." Plaintiff was diagnosed with low back pain, PTSD, and degenerative joint disease (bilateral knees). He was prescribed Lodine and referred for a mental health screening (R. 1167).

On April 15, 2002, Sharon Eder, M.D., reviewed the findings contained in the March 11, 2002, Physical Residual Functional Capacity Assessment of Plaintiff by Dr. Westfall and affirmed same (R. 1331).

On April 18, 2002, Plaintiff was issued a cane to aid in ambulation (R. 1158).

34

On May 2, 2002, the Veterans Administration increased Plaintiff's evaluation of PTSD to fifty percent disabling (R. 1118).

On May 2, 2002, Plaintiff reported to Brenda G. Adams, R.N., a VA psychiatric nurse clinician, that he had become depressed. He reported he had been awarded a 60% disability for PTSD, but reported his "thoughts/dreams of war zone" had increased.[1] He stated he had taken Paxil until one month earlier, and it helped him "stay calm." He told Ms. Adams he smoked marijuana daily "for medical purposes [because] it helps me forget what happened" (R. 1156). Plaintiff was instructed to return to the VAMC on May 9, 2002, for PTSD education classes (R. 1157).

On May 6, 2002, Plaintiff reported to Martha Guyon, M.D., at the Emergent Care psychology department of the VAMC, for complaints of left knee and lower back pain. Plaintiff informed Dr. Guyon he smoked marijuana occasionally as it relaxed him. Plaintiff appeared "disheveled" and "poorly groomed." Plaintiff was "alert . . . fully oriented, engageable, mood mildly anxious to irritable . . . thoughts goal directed . . . no psychotic [symptoms], no lethal ideation" (R. 1154). Dr. Guyon's impression was chronic PTSD, cannabis dependence, and chronic pain (R. 1154-155). Dr. Guyon strongly urged Plaintiff to cease his use of cannabis and prescribed Paxil (R. 1155).

On May 9, 2002, Plaintiff was evaluated by the Hampton VAMC PTSD treatment team. It was decided Plaintiff should enroll in a ten-week psychoeducation class. The team expected the benefits to Plaintiff from this treatment would be "decreased intensity of all or some PTSD symptoms"; "increased knowledge base about PTSD symptoms"; and the development of "new coping skill" (R. 1155). Plaintiff, on May 9, 2002, attended his first session of the PTSD psychoeducation class (R. 1153). Plaintiff also attended sessions on May 23 and May 30, 2002 (R.

_____

[1]The evidence indicates Plaintiff was not in combat during his time in the military.

1152-153).

On June 6, 2002, Plaintiff underwent a medication evaluation for PTSD. Naheed S. Sabir, M.D., conducted the evaluation. Plaintiff reported his PTSD symptoms were "recurrent nightmares, flashbacks, intrusive thoughts, social withdrawal, depressed mood, generalized anxiety, difficulty concentrating, poor attention span, insomnia, irritability, and nightsweats." Dr. Sabir noted Plaintiff's symptoms were "further complicated by a history of substance abuse (cannabis)." Plaintiff informed Dr. Sabir he had undergone rehabilitation for cannabis use, but he had been using marijuana for "more than 30 years" (R. 1149). Dr. Sabir observed Plaintiff did not present with psychotic symptoms, his mood was anxious, his speech was pressured with normal tone, his thoughts were tangential, and Plaintiff's insight and judgment were intact. Dr. Sabir diagnosed chronic PTSD and dysthymia. He prescribed Paxil and Trazodone. He recommended Plaintiff continue with PTSD education classes and psychological therapy (R. 1150).

On June 8, 2002, Plaintiff reported to the Hampton VAMC Emergent Care facility with dizziness and tinnitus in both ears. He was prescribed Cipro (R. 1148).

On June 10, 2002, Marinell Miller Mumford, Ph.D., completed a Medical Assessment of Ability to do Work-Related Activities (Mental). Dr. Mumford found Plaintiff's ability to follow work rules and function independently was fair. Dr. Mumford found Plaintiff had a poor ability to relate to coworkers, deal with the public, use judgment with the public, interact with supervisors, deal with stresses, and maintain attention and concentration (R. 1332). Dr. Mumford found Plaintiff had a fair ability to understand, remember, and carry out simple job instructions. Plaintiff was found to have a poor ability to understand, remember and carry out complex job instructions and detailed, but not complex, job instructions. Dr. Mumford opined Plaintiff showed deficient short

36

term memory and problems in concentration. Dr. Mumford found Plaintiff had a fair ability to demonstrate reliability. Plaintiff's ability to maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations were found to be poor (R. 1333). Dr. Mumford noted Plaintiff had "several physical disabilities that cause impairments in his work performance. He has recently had a total knee replacement, hearing loss, low back pain, and otitis media-chronic. However, he is considered unemployable for any type of competitive work due to his psychiatric illness, PTSD and personality disorder, NOS" (R. 1334).

On February 7, 2003, Dr. Mumford completed a psychological evaluation of Plaintiff. Dr. Mumford noted Plaintiff, prior to the completion of the ten-week psychoeducational class for PTSD at Hampton VAMC, had been treated as an inpatient for PTSD at the American Lakes VAMC for eight weeks and had participated in a twenty-four months PTSD program in 2001 at White City VAMC (R. 1371). Dr. Mumford noted Plaintiff presented with "symptoms of profoundly disabling PTSD, which include intrusive thoughts of the traumatic event." Plaintiff's symptoms were noted as intrusive daily thoughts of traumatic event, repetitive (nightly) traumatic nightmares, hallucinatory flashbacks, distress "upon exposure to cues which remind him of the trauma," and extreme fears of "those of the black race." Plaintiff reported "avoidance symptoms of social detachment, inability to tolerate crowds of people, estrangement from family and friends, and reluctance to talk about the trauma" (R. 1371). Plaintiff reported he slept for two to three hours at a time. Dr. Mumford opined Plaintiff had "problems with impaired thought processes and communication. He has problems taking turns when talking and has problems with active listening. He has periods of grossly inappropriate behavior and is intrusive in interpersonal relationships. He has poor personal hygiene [and] is unable to maintain cleanliness with consistence. Dr. Mumford observed Plaintiff to be tense

and guarded with logical speech and problems with tangential thought. She noted Plaintiff's thought processes were intact without evidence of psychosis. Dr. Mumford opined Plaintiff's mood was depressed and anxious and his insight and judgment were poor (R. 1372). Dr. Mumford diagnosed the following: Axis I – chronic PTSD that impacted social and vocational function ("unemployable"); Axis II – none; Axis III – total knee replacement, chronic back pain with bulging L disc, T9-T10 disc missing, vertigo, tinnitus, otitis media; Axis IV – problems with primary support group, inadequate social support, unemployable, housing problems, and inadequate finances; and Axis V – GAF was forty-one (R. 1373).

On April 28, 2003, Plaintiff was notified by the Department of Veterans Affairs that, effective December 1, 2002, he would receive $2,193.00 monthly as entitlement for an overall or combined rating of seventy percent due to PTSD (R. 1114-115).

Hypothetical Questions and VE Testimony

At the administrative hearing on June 16, 2003, Plaintiff testified he had last smoked marijuana one week earlier, but he would "just burn one" with his friends occasionally. He testified:

> I do that because of medicinal purposes and it helps me. I self medicate myself sometimes, Your Honor. It's not like it's an addiction. I just have depression, anxiety. I've had all this with my PTSD and I sit back and I got these big pains coming out [inaudible] of my body.

(R. 1418). It had been a long time since he smoked marijuana before that, because he had been at the VA "and out there [he] was tested every week." He also testified his PTSD was a result of his having been raped by a black male Sergeant while in the Army.

The following question/answer exchange occurred between ALJ Barr and the VE:

ALJ:   Let me put some hypothetical questions to you now. For these I want you to assume you're dealing with an individual who's a younger individual, who has a limited education and past work experience as described here today.

38

For the first hypothetical, I want you to assume that this individual would be limited to sedentary work as it's defined in the Social Security Regulations with further restrictions, then, that he would need to be able to periodically alternate between sitting and standing. He would need to avoid complex or detailed tasks. He would need to avoid close interaction with the general public. Would there be any jobs such an individual could perform? (R. 1422-223).

VE:     Yes. Jobs would include surveillance system monitor with 105,000 nationally, 3,000 in Virginia and sedentary assembler with 50,000 nationally, 1,5000 in Virginia. Those are sedentary, unskilled jobs (R. 1423).

The ALJ asked the VE if there was any difference between the way she used the jobs she named and the way they were described in the Dictionary of Occupational Titles? The VE replied that there was no difference (R. 1423).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.     The claimant met the disability insured status requirements of the Social Security Act on his alleged date of disability onset and he continued to meet those requirements through June 30, 1999, but not thereafter.

2.     Absent credible evidence to the contrary, the claimant has not engaged in disqualifying substantial gainful activity since May 1, 1995, his alleged date of disability onset.

3.     The medical evidence establishes that the claimant has severe impairments due to the residuals of an ACL injury to the left knee, status post multiple knee surgeries, including total knee replacement in June 2001; eustachion [sic] tube dysfunction with mild sensorineural hearing loss, status post ear tubs [sic]; low average to borderline intellectual functioning; post traumatic stress disorder (non-combat but military related); and polysubstance abuse with continued use of marijuana.

4.     Considering the claimant's substance abuse disorder, the severity of his mental impairments met the criteria of section 12.09 of Appendix 1, Subpart P of Social Security Regulations No. 4, and has precluded him from working for at least 12 continuous months. Therefore, the claimant is disabled within the meaning of the Social Security Act.

5.  Considering only the impairments that would remain if the claimant were to stop smoking marijuana, he would not have any remaining impairment or combination of impairments that meets or medically equals the criteria of any of those continued in Appendix 1.

6.  The claimant's allegations regarding his impairments, including pain, and their limitations on his ability to work are not totally credible for the reasons set forth in the body of the decision.

7.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR 404.1527 and 416.927).

8.  Considering the impairments and limitations that would remain if the claimant stopped smoking marijuana, he would have the residual functional capacity to perform the exertional requirements of at least unskilled sedentary work, lifting and carrying no more than 10 pounds, standing and/or walking at least two hours out of eight and sitting at least six hours out of eight, provided he has the opportunity to alternate sitting and standing at his discretion (sit/stand option); and the performance of work that does not involve complex/detailed tasks due to his intellectual functioning; or any close interaction with the general public thus minimizing his contact with the public.

9.  The claimant is unable to perform any of his past relevant work.

10. The claimant is a "younger individual age 45-49." He was a "younger individual age 18-44" at the time of his alleged date of disability onset. He has a "limited" education.

11. The claimant's past work experience ranges from unskilled to semi-skilled in nature. In view of his age and residual functional capacity, transferability of skills is not an issue in this case.

12. If the claimant were capable of performing a full range of sedentary work, a finding of "not disabled" would be reached by direct application of Medical-Vocational Guidelines Rules 201.19, 201.20, 201.25 and 201.26. Strict application of the above-cited rules is not possible, however, as the claimant has additional exertional (sit/stand option) and non-exertional mental limitations and restrictions which narrow the range of work he is capable of performing.

13. Considering the claimant's age, education, past work experience and residual functional capacity that would remain if he were to stop his drug abuse, he would be able to make a successful adjustment to work as a surveilance [sic] system monitor

40

and sedentary assembler that exists in significant numbers in the national economy. Therefore, a finding of "not disabled" is reached within the framework of the above-cited medical-vocational rules (20 CFR 404.1520(f) and 416.920(f)).

14.     The limitations that would remain if the claimant stopped smoking marijuana would not be disabling.

15.     The claimant's substance abuse is a contributing factor material to the finding of his disability as of May 1, 1995.

16.     The claimant was not under a "disability," as defined in the Social Security Act, as a matter of law, at any time through the date of this decision, much less on or before June 30, 1999, the date his disability insured status expired, and benefits are not compensable under the Social Security Act as amended by the terms of Public Law 104-121. Therefore, his disability doe not entitle him to benefits under the Social Security Act and Regulations (R. 59-60).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an

improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir.

1987).

## B. Contentions of the Parties

The Plaintiff contends:

1.    If an administrative law judge ("ALJ") relies on the testimony of a vocational expert ("VE"), the questions to the VE must completely and accurately state all limitations and disabilities of a claimant, and the VE's testimony must be consistent with the Dictionary of Occupational Titles ("DOT"). In this case, the ALJ's questions to the VE were not accurate, and the VE's testimony was not consistent with the DOT. Therefore, the ALJ's unfavorable decision should be reversed or remanded, for either or both of the above reasons.

2.    An ALJ must properly evaluate a claimant's activities in order to determine accurate limitations. In this case, the ALJ cited the claimant's participation in a Veterans Administration (VA") incentive therapy program and the fact that he was able to live in a VA domiciliary as one of the bases for ruling that the claimant had only mild to moderate limitations. That analysis was contrary to Social Security Requirements and, therefore was flawed.

3.    If an ALJ does not properly weigh the opinions of treating physicians, then he may not reject those opinions. In this case, the ALJ discounted the opinions of two treating physicians because, as one criterion, he found they were not supported by the "majority of the mental status examinations in evidence." This was an improper analysis and should have not been used in determining the weight to be given to the opinions of those treating physicians.

The Commissioner contends:

1.    The ALJ properly relied upon valid vocational expert testimony.

2.    Based upon the evidence of record, the ALJ properly determined that Plaintiff was

not disabled, absent his alcohol and drug use.

## C. Hypothetical to the VE

Plaintiff first argues:

If an administrative law judge ("ALJ") relies on the testimony of a vocational expert ("VE"), the questions to the VE must completely and accurately state all limitations

and disabilities of a claimant, and the VE's testimony must be consistent with the Dictionary of Occupational Titles ("DOT"). In this case, the ALJ's questions to the VE were not accurate, and the VE's testimony was not consistent with the DOT. Therefore, the ALJ's unfavorable decision should be reversed or remanded, for either or both of the above reasons.

Defendant contends the ALJ properly relied upon valid expert testimony. The undersigned will address the issue regarding conflict with the DOT separately below.

At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)).

In Koonce v. Apfel, 166 F.3d 1209 (4th Cir. 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. See also Lee v. Sullivan, 945 F.2d 689 (4th Cir. 1991)(noting that

a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record.")

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. <u>Edwards v. Bowen</u>, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." <u>English v. Shalala</u>, 10 F.3d 1080, 1085 (4th Cir. 1993).

The ALJ here first determined Plaintiff had the severe impairments of ACL injury to his left knee status post multiple surgeries; eustachian tube dysfunction, status post ear tubes with sensorineural hearing loss; PTSD; polysubstance abuse; and low-average to borderline intellectual functioning (R. 46). The ALJ then found that Plaintiff met Listing 12.09 for substance addiction disorders, and was therefore under a disability beginning March 1, 1995, continuing through the date of the decision; however, the ALJ also found that if Plaintiff stopped his marijuana abuse, his remaining impairments would not be disabling.[2] He found that, absent substance abuse, Plaintiff's remaining impairments would cause no more than moderate limitations of activities of daily living, social functioning, and concentration, persistence or pace. The ALJ further explained that, while Plaintiff could not perform complex/detailed tasks either due to his intellectual functioning or

_____

[2] 42 U.S.C. § 423(d)(2)(C) provides:

**(C)** An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

substance abuse, his ability to perform simple, repetitive tasks was shown by his successful performing of his duties in the Incentive Therapy Program. Additionally, absent his substance abuse, Plaintiff would have had no periods of decompensation. Based on these findings, the ALJ determined that, absent marijuana abuse, Plaintiff had the Residual Functional Capacity ("RFC") to perform at least unskilled, sedentary work which would allow him to alternate sitting and standing and would be routine and repetitive in nature and not involve complex/detailed tasks or close interaction with the general public.

Based on Plaintiff's RFC, the ALJ then asked the VE if there would be any jobs available for a hypothetical individual of Plaintiff's age, education, and work background, who was limited to unskilled sedentary work with the ability to periodically alternate between sitting and standing, who would need to avoid complex or detailed tasks and close interaction with the general public. In response, the VE named several sedentary, unskilled jobs. Plaintiff argues that this hypothetical does not include any limitation on concentration, persistence or pace. Plaintiff does not cite any Fourth Circuit cases requiring the ALJ to include in his hypothetical every limitation included in his PRT. Plaintiff cites Breeding v. Barnhart, 2005 WL 476123 (W.D.Va.) in support of his argument. Breeding, however, does not address the relevant issue here, whether the ALJ must include his PRT findings in his hypothetical to the VE.

The undersigned has located two unpublished Fourth Circuit cases which conclude the opposite. In Colvard v. Chater, 59 F.3d 165 (4th Cir. 1995)(unpublished),[3] the ALJ indicated on the PRT form that the claimant "often experienced deficiencies with concentration, persistence, and

_____

[3]Pursuant to CTA4 Rule 36(c), the undersigned has attached copies of the two Fourth Circuit unpublished cases to this Report and Recommendation.

pace." Id. The ALJ did not, however, include that conclusion in his hypothetical to the VE. Similar to Plaintiff's argument here, the claimant in Colvard argued that the ALJ's hypothetical to the VE "should have contained a reference that he often experiences deficiencies with concentration, persistence, and pace resulting in failure to complete tasks in a timely manner." The Fourth Circuit, however, disagreed, stating that the statement in the PRT "merely reflect[ed] the ALJ's conclusion, and we find that the hypothetical properly included all of the limitations discussed in Dr. Hogan's report." The ALJ had relied on Dr. Hogan's report in his decision.

In Yoho v. Commissioner, 168 F.3d 484 (4th Cir. 1998), the claimant argued, similar to Plaintiff's argument here:

> The ALJ was obligated to include her stated limitations as recorded in the Psychiatric Review Technique Form ("PRTF") in her hypotheticals to the VE.

In Yoho, the ALJ had indicated in her PRT that the claimant "often" had deficiencies of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner. The Fourth Circuit held as follows:

> The ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment and fairly set out the claimant's impairments. See English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993); Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). There is no obligation, however, to transfer the findings on the PRTF verbatim to the hypothetical questions.

Id.

Finally, in a recent district court case, Harris v. Commissioner, 2005 WL 1162530 (E.D.Va.), the court found that a limitation to performing simple, repetitive tasks adequately accounted for a finding that the claimant had a "rather short" attention span. The court cited Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002) and Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) ("the

ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures Howard's [often having] deficiencies in concentration, persistence or pace."). See also Nixon v. Barnhart, 9 Fed. Appx. 254, 84 Soc. Sec. Rep. Serv. 13 (10th Cir. 2002)("The ALJ's RFC assessment included the limitation that it was impossible for Ms. Nixon to perform tasks requiring understanding, remembering, or carrying out more than simple instructions. These limitations in the ALJ's RFC assessment adequately account for Ms. Nixon's ["often" experiencing] deficiencies in concentration, persistence, and pace.")

Notably, in the case at bar, the ALJ did not indicate on his PRT that Plaintiff "often" had deficiencies in concentration, persistence or pace, but only that he "no more than a moderate limitation," a much lesser degree of limitation. Pursuant to Yoho, The ALJ was not required to include this limitation verbatim in his hypothetical to the VE. The ALJ limited Plaintiff to unskilled jobs with a need to avoid complex or detailed tasks and to avoid close interaction with the general public. The undersigned finds this limitation is supported by the evidence. The State agency reviewing psychologists (R. 699, 992, 1013, 1024, 1310), found Plaintiff had a mental RFC for simple, routine work, even considering his substance dependence and abuse, which the ALJ necessarily did not consider. Dr. Insinna opined Plaintiff "seldom" had a deficiency of concentration, persistence or pace, and would be able to engage in at least simple, routine, basic work. Dr. Kedakkal opined Plaintiff's ability to maintain attention, concentration, and pace was "not significantly limited," and he would be capable of doing simple work. Drs. Hennings and Wimmers both found Plaintiff would "often" have deficiencies of concentration, persistence or pace, but still concluded Plaintiff was capable of understanding, remembering, and carrying out simple work. Finally, Dr. Anderson in 2002, opined Plaintiff had only a "history of" PTSD, which was not even

47

a "severe" impairment at that time. Dr. Wimmers subsequently agreed with this conclusion. The ALJ was not only entitled, but was required to consider these expert opinions, as discussed below.

In addition, examining psychologist Dr. Pearson opined that Plaintiff had only mild to moderate limitations and a GAF of 65.[4] He had adequate hygiene and grooming, was completely oriented and cooperative, exhibited excellent social and communicative skills, his affect was appropriate, and there was no evidence of obvious mood disturbance. Dr. Pearson concluded that Plaintiff should be able to return to some kind of competitive employment, especially if he remained clean and sober.

For all the above reasons, the undersigned finds the limitations in the ALJ's hypothetical to the VE were supported by substantial evidence in the record. <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir 1999).

## D. Consistency with the DOT

As part of the above argument, Plaintiff also argues the VE's testimony was not consistent with the DOT ["Dictionary of Occupational Titles"]. Pursuant to Social Security Regulation ("SSR") 00-4p, the ALJ did inquire of the VE whether the jobs she named in response to his hypothetical were consistent with the DOT, and the VE responded that they were. Plaintiff in particular contends that the job of surveillance system monitor does not appear to be "unskilled," as required by the ALJ's hypothetical, and the job of assembler "do[es] not, at least as far as the DOT

---

[4]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

states, allow a sit/stand option, as required by the ALJ." (Plaintiff's brief at 5). According to the

DOT, the job Surveillance-System monitor, 379.367-010, has an SVP ("Specific Vocational

Preparation") Level of 2. According to Social Security Ruling (SSR") 00-4p:

> A skill is knowledge of a work activity that requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation that is above the unskilled level (requires more than 30 days to learn). (See SSR 82-41.) Skills are acquired in PRW and may also be learned in recent education that provides for direct entry into skilled work.

> The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.

(Emphasis added). Therefore, the job of surveillance system monitor, with an SVP of 2, is consistent

with the ALJ's hypothetical requiring the work to be "unskilled."

Regarding the issue of whether the sit-stand option is included in DOT's descriptions of the

named jobs, a search of the DOT itself indicates there is no reference to a sit-stand option at all. This

finding is supported by VE testimony the undersigned has read in numerous cases, testifying that the

DOT does not address a sit-stand option, nor, in fact, do the Social Security regulations. The

undersigned therefore finds the lack of a sit-stand option in the DOT does not conflict with the VE's

testimony that certain jobs would be available with a sit-stand option in the national economy. As

SSR 00-4p provides:

> Evidence from VEs or VSs can include information not listed in the DOT. The DOT contains information about most, but not all, occupations. The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term "occupation," as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs. Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or

career counseling.

> The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.

(Emphasis added).

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that a significant number of jobs exist in the national and local economy for an individual with the limitations addressed in the first hypothetical.

### E. Claimant's Activities

Plaintiff next argues:

> An ALJ must properly evaluate a claimant's activities in order to determine accurate limitations. In this case, the ALJ cited the claimant's participation in a Veterans Administration (VA") incentive therapy program and the fact that he was able to live in a VA domiciliary as one of the bases for ruling that the claimant had only mild to moderate limitations. That analysis was contrary to Social Security Requirements and, therefore was flawed.

Defendant contends that, based upon the evidence of record, the ALJ properly determined that Plaintiff was not disabled, absent his alcohol and drug use. The ALJ cited many reasons for his findings that Plaintiff's limitations were mild to moderate, including that Plaintiff was independent in his personal care; a third party statement indicating that Plaintiff went to movies and dances, shopped and did laundry, read, drove, walked up to half a mile, and did chores in the domiciliary; Plaintiff's own description of his work in the IT program, which entailed working at a desk six to seven hours per day, five days per week; his successful work as a Senior Section Leader; and his ability to maintain his own household. The ALJ also considered the reviewing State psychologists'

50

opinions that Plaintiff had no more than mild to moderate limitations in his activities of daily living, social functioning, and ability to maintain concentration, persistence or pace. The ALJ also considered that Plaintiffs' frequent mental health treatment generally involved substance abuse; that he related well to others in the domiciliary <u>when abstinent</u>; that he got along well with others <u>when sober</u>; that he moved to Seattle to help his family manage an apartment complex; and that medication had a positive effect, but that he was not always compliant with his medications. Significantly, State agency reviewing psychologist Dr. Insinna opined:

> Mr. Corbett's progress through the phases of the Domiciliary Homeless Program and [substance abuse treatment] indicates he is able to engage in and perform at least simple and routine, basic work. Mr. Corbett is to be commended for engaging in this program lasting almost one year. With the idea that he continues his sobriety he should be an asset to the community, being able to have a productive life.

(R. 710). This opinion, by a State agency expert in psychology, substantially supports the ALJ's inclusion of Plaintiff's VA experience in determining that Plaintiff could perform simple work.

The undersigned finds that the ALJ did not err by including Plaintiff's successful work experiences in the IT program and his ability to get along with others and take care of his personal needs while in the domiciliary in his determination of Plaintiff's functional limitations. This is supported by the State expert's similar conclusion. Even if such consideration had been improper, the numerous other factors the ALJ considered substantially supported his RFC determination.

### F. Treating Physician Opinions

Plaintiff next argues:

> If an ALJ does not properly weigh the opinions of treating physicians, then he may not reject those opinions. In this case, the ALJ discounted the opinions of two treating physicians because, as one criterion, he found they were not supported by the "majority of the mental status examinations in evidence." This was an improper

analysis and should have not been used in determining the weight to be given to the opinions of those treating physicians.

Plaintiff refers in particular to two physicians, Dr. Mumford and Dr. Otis, and his vocational rehabilitation counselor, Mr. Harrison.

The undersigned first notes that Mr. Harrison, a vocational rehabilitation counselor, is not an "acceptable medical source" under the regulations. See 20 CFR § 404.1513(a). The ALJ was therefore not required to give great weight to or even consider his opinion. Mr. Harrison is, however, an "other source," under § 404.1513(d), whose opinion "may" be considered by the ALJ it in making his determination. In fact, the ALJ did, in fact, discuss Mr. Harrison's opinion, as discussed below. He was not required to accord it any significant weight, however.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). On the other hand, the Fourth Circuit also stated:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
> >
> > By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial

evidence, it should be accorded significantly less weight.

The ALJ referred to Dr. Miller-Mumford as an "examining psychologist," not as a treating psychologist. A review of the record indicates Plaintiff first saw Dr. Mumford (then Miller) on May 22, 1997. At that time she opined his mood was "non-depressed and anxious with mood congruent affect," and his insight and judgment were intact (R. 722). She diagnosed PTSD and Polysubstance Abuse, and assessed his GAF as 50 (current). He was enrolled in the PTSD clinic. Three months later, Plaintiff reported he continued to have a positive therapeutic response to Paxil, and was less anxious, sleeping better, and did not "pace the floors." Plaintiff stated that "keeping busy and attendance at the educational classes on PTSD help[ed] him as well." Plaintiff revealed no psychosis or suicidal or homicidal ideation. His insight and judgment were intact. Two months later he moved to Washington to work as a property manager at an apartment complex run by family members. Dr. Miller encouraged him to follow up with his PTSD treatment "in spite of his difficulties with finding proof of his rape." She opined he had benefitted from treatment. She opined his mood was non-depressed, his thoughts were logical, and his insight and judgment unimpaired.

According to the record, the next time Plaintiff saw Dr. Miller was more than four years later, on June 10, 2002, after he returned from Washington. He reportedly had lost his job when he was "thrown out" by his brother either for smoking pot, or because his brother drank and he did not, depending upon how Plaintiff reported the event at different times to different doctors (R. 1391). On June 10, 2002, Dr. Mumford completed a Medical Assessment of Ability to do Work-Related Activities (Mental). She noted he had "several physical disabilities that cause impairments in his work performance," but noted he was "considered unemployable for any type of competitive work due to his psychiatric illness, PTSD and personality disorder, NOS" (R. 1334). Dr. Mumford based

53

her limitations on "group observation and individual interactions" and "problems remembering appointments and [] missed appointments due to forgetting." The undersigned finds it significant that Plaintiff subsequently admitted he was had been using marijuana around the time of this evaluation.

On February 7, 2003, Dr. Mumford completed a second psychological evaluation of Plaintiff. Dr. Mumford noted Plaintiff, prior to the completion of the ten-week psychoeducational class for PTSD at Hampton VAMC, had been treated as an inpatient for PTSD at the American Lakes VAMC for eight weeks and had participated in a twenty-four months PTSD program in 2001 at White City VAMC (R. 1371). Dr. Mumford noted Plaintiff presented with "symptoms of profoundly disabling PTSD, which include intrusive thoughts of the traumatic event." Plaintiff's symptoms were noted as intrusive daily thoughts of traumatic event, repetitive (nightly) traumatic nightmares, hallucinatory flashbacks, distress "upon exposure to cues which remind him of the trauma," and extreme fears of "those of the black race." Plaintiff reported "avoidance symptoms of social detachment, inability to tolerate crowds of people, estrangement from family and friends, and reluctance to talk about the trauma" (R. 1371). Plaintiff reported he slept for two to three hours at a time. Dr. Mumford opined Plaintiff had "problems with impaired thought processes and communication. He has problems taking turns when talking and has problems with active listening. He has periods of grossly inappropriate behavior and is intrusive in interpersonal relationships. He has poor personal hygiene [and] is unable to maintain cleanliness with consistence. Dr. Mumford observed Plaintiff to be tense and guarded with logical speech and problems with tangential thought. She noted Plaintiff's thought processes were intact without evidence of psychosis. Dr. Mumford opined Plaintiff's mood was depressed and anxious and his insight and judgment were poor (R.

1372). Dr. Mumford diagnosed the following: Axis I – chronic PTSD that impacted social and vocational function ("unemployable"); Axis II – none; Axis III – total knee replacement, chronic back pain with bulging L disc, T9-T10 disc missing, vertigo, tinnitus, otitis media; Axis IV – problems with primary support group, inadequate social support, unemployable, housing problems, and inadequate finances; and Axis V – GAF was forty-one (R. 1373).

In between these two evaluations by Dr. Mumford, Defendant continued to admit his use of alcohol and drugs had exacerbated his symptoms. He noted he had last used marijuana around the time of Dr. Mumford's June evaluation. Since that time, he reported coping better, his mood was "good," he denied mood symptoms, denied paranoia, and denied hallucinations. Upon mental status exam, he had a good mood with euthymic affect and his insight and judgment were intact. There did not appear to be any cognitive, physical or literary barriers present during the time between the first and second evaluations. The undersigned finds these observations inconsistent with Dr. Mumford's assessments. In addition, Dr. Mumford expressly stated her assessment was based not on any laboratory or clinical testing, but on observation of Plaintiff and on Plaintiff's missing appointments.

Although the ALJ refers to Dr. Otis as a "treating Psychologist," the undersigned notes the record indicates Plaintiff saw Dr. Otis on May 12, 1999, for an Addiction Severity Index interview; May 17, 1999, for a psychological evaluation; and July 28, 2000, to discuss Dr. Pearson's evaluation.

At the Addiction Severity Index interview, Plaintiff told Dr. Otis that he had never been treated for alcohol or drug abuse and that he considered "treatment for psychological or emotional problems to be not at all important" (R. 924). After this subjective interview, Dr. Otis found Plaintiff had zero severity of employment, and zero severity of alcohol or drug problems. On May 17, 1999, Dr. Otis conducted a mental status examination and personality testing (R. 871-75, 947-

50). Plaintiff stated he was fired from his last regular job as a bus driver because he tested positive for marijuana (R. 872). Plaintiff stated he began using marijuana at the age of ten and had tried cocaine "a few times, but had never used it regularly." Plaintiff informed Dr. Otis that he had "one 'suicide attempt,'" but admitted that had occurred when he was "applying to enter the Hampton VAMC . . . and . . . had learned from other veterans that one way to avoid getting turned down for admission was to report a suicide attempt." Plaintiff asserted he had been "raped" while stationed in Germany in 1975, and, as a result continued to have nightmares (R. 873). Dr. Otis made the following diagnoses: Axis I – post-traumatic stress disorder and cannabis dependence; Axis II – features of histrionic personality disorder; Axis IV – psychosocial and environmental problems: homeless, low income, unemployed; and Axis V – GAF of forty-five (R. 874). Dr. Otis recommended Plaintiff be referred to Recreation Service, consult with a substance abuse counselor, and have his anxiety medications re-evaluated (R. 875).

The undersigned does not agree that Dr. Miller-Mumford and Dr. Otis meet the requirement that a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

Dr. Mumford saw Plaintiff in May 1997, and he moved to Washington only about six months later to work. In the meantime, Dr. Mumford opined Plaintiff had benefitted from treatment; his mood was non-depressed; his thoughts were logical; and his insight and judgment unimpaired despite his not being on any psychotropic medications. Even if this was a treating relationship, it indicates that Plaintiff had improved within six months to a point where he could move to go to work, without any medications. After four years, Plaintiff again saw Dr. Mumford, but only a few

times within an eight-month period.

Within an 18-month period, it appears Dr. Otis saw Plaintiff only two or three times.

Even if these two psychologists are properly referred to as "treating psychologists," the undersigned finds the ALJ did not commit reversible error by not according them significant weight. The ALJ determined Dr. Otis' and Dr. Mumford's evaluations were not supported by nor were they consistent with the treatment records or other evidence of record.

The ALJ first noted a 1999 psychiatric evaluation showing no more than mild PTSD symptomology. He then noted there was "essentially no psychiatric medical evidence made between 1999 and May 2002, to show greater disability." He particularly discussed examining psychologist Dr. Pearson's report of June 2000. Plaintiff was referred to Dr. Pearson by his vocational counselor at the VA, Mr. Harrison. Dr. Pearson performed a battery of tests in addition to a 1½ hour interview. In contrast to Dr. Otis' opinion, Dr. Pearson opined that Plaintiff had only mild to moderate limitations and a GAF of 65. He had adequate hygiene and grooming, was completely oriented and cooperative, exhibited excellent social and communicative skills, his affect was appropriate, and there was no evidence of obvious mood disturbance. Dr. Pearson concluded that Plaintiff should be able to return to some kind of competitive employment, especially if he remained clean and sober.

Mr. Harrison reviewed Dr. Pearson's report and opined that Plaintiff would be hard pressed to compete for the vast majority of jobs in the local labor market in southern Oregon. Dr. Otis, the staff psychologist, similarly opined that Plaintiff's "back condition" would likely restrict the number of jobs in competitive employment situations which would be available to him, stating: "Because of potential liability, employers tend to not want to take risks on individuals with back problems."

He also noted "the chances of him finding one that would pay enough for him to live on are slight."

As the ALJ properly found, however, that whether or not a claimant is actually hired, remains employed or makes a certain income is not relevant to the issue of whether a claimant is disabled for purposes of Social Security disability. 20 CFR § 404.1566(c) provides:

> We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exits in the national economy, but you remain unemployed because of –
>
>> (1) Your inability to get work;
>>
>> (2) Lack of work in your local area;
>>
>> (3) The hiring practices of employers;
>>
>> (4) Technological changes in the industry in which you have worked;
>>
>> (5) Cyclical economic conditions;
>>
>> (6) No job opportunities for you;
>>
>> (7) You would not actually be hired to do work you could otherwise done; or
>>
>> (8) You do not wish to do a particular type of work.

Further, the determination that a claimant is "unable to work" is an issue reserved to the Commissioner. 20 CFR § 404.1527(e) provides:

> (e) *Medical source opinions on issues reserved to the Commissioner.* Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.
>
> (1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.
>
> (2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature

and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

Social Security Ruling ("SSR") 96-5p further provides, in pertinent part:

Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

Further, Dr. Otis, a psychologist's, opinion on Plaintiff's back problems and his capacity to work due to physical problems is beyond his expertise, and therefore is not entitled to any significant weight. Most importantly, Dr. Otis' and Dr. Mumford's opinions were not supported by clinical evidence and are inconsistent with other substantial evidence. In addition to Dr. Pearson's well-supported evaluation, the ALJ also considered the State agency reviewing physicians' and psychologists' opinions. 20 CFR § 404.1527(f)(2)(i) provides:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

As the ALJ found, the State agency reviewing physicians opined Plaintiff had a physical RFC for light or medium work (R. 476, 691, 698, 1005, 1012), and the State agency reviewing

psychologists (R. 699, 992, 1013, 1024, 1310), found he had a mental RFC for simple, routine work. Dr. Insinna found Plaintiff's progress through the Domiciliary Homeless Program and Substance abuse treatment indicated he would be able to engage in and perform at least simple and routine, basic work. She noted:

> Mr. Corbett is to be commended for engaging in this program lasting almost one year. With the idea that he continued his sobriety he should be an asset to the community, being able to have a productive life.

(R. 710). In March 2002, Dr. Anderson, Ph.D. opined Plaintiff had only a "history of" PTSD, and no severe mental impairments whatsoever (R. 1310). This opinion was affirmed by Dick Wimmer, Ph.D. in April 2002. The ALJ was not only entitled, but was required to consider these expert opinions.

In Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), the Fourth Circuit stated that the ALJ bears the ultimate responsibility for weighing the evidence and resolving any conflicts, and that, in reviewing for substantial evidence, the reviewing court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. The undersigned finds substantial evidence supports the ALJ's determination that Dr. Otis' Dr. Mumford's and Mr. Harrison's opinions were inconsistent with other substantial evidence. "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, supra.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's according little weight to Dr. Otis' Dr. Mumford's and Mr. Harrison's opinions and according greater weight to Dr. Pearson's and the State agency psychologists' opinions.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** Plaintiff's Motion for Summary Judgment be **DENIED**, and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _23_ day of February, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

Westlaw.

59 F.3d 165 (Table)

59 F.3d 165 (Table), 1995 WL 371620 (4th Cir.(Va.))
**Unpublished Disposition**

**(Cite as: 59 F.3d 165, 1995 WL 371620 (4th Cir.(Va.)))**

**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
Russell COLVARD, Plaintiff-Appellant,
v.
Shirley S. CHATER, Commissioner of Social
Security, Defendant-Appellee.
**No. 94-1457.**

Submitted June 8, 1995.
Decided June 21, 1995.

Appeal from the United States District Court for the Western District of Virginia, at Big Stone Gap. Glen M. Williams, Senior District Judge. (CA-89-32-B)

W.D.Va. SY AFFIRMED.

Joseph E. Wolfe, WOLFE & FARMER, Norton, Virginia, for Appellant.

Charlotte Hardnett, Chief Counsel, Region III, Dorothea J. Lundelius, Division Chief, Margaret J. Krecke, Assistant Regional Counsel, Office of the General Counsel, DEPARTMENT OF HEALTH AND HUMAN SERVICES, Philadelphia, Pennsylvania; Robert P. Crouch, Jr., United States Attorney, Richard A. Lloret, Assistant United States Attorney, Roanoke, Virginia, for Appellee.

OPINION

Before HALL and WILKINSON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

PER CURIAM:

**\*\*1** Appellant Russell Colvard appeals the final decision of the Secretary of Health and Human Services ("Secretary") denying his claims for Social Security Benefits. For the reasons discussed below, we find that the Secretary's decision is supported by substantial evidence and affirm the Secretary's ruling.

I.

In April, 1988, Colvard filed claims for disability insurance benefits and supplemental security income pursuant to the Social Security Act, 42 U.S.C. §§ 401-433 (1988 & Supp. V 1993) and 42 U.S.C. §§ 1381-1383d (1988 & Supp. V 1993), respectively. After conducting a hearing, the Administrative Law Judge ("ALJ") found no disability under the Act and denied Colvard's claims. The ALJ's decision became the final decision of the Secretary when the Appeals Council refused to review the decision. Colvard then appealed the ALJ's decision to the United States District Court for the Western District of Virginia. On March 26, 1990, the district court remanded the case for "good cause" and ordered the ALJ to further develop the record regarding Colvard's nonexertional limitations. The ALJ held a supplemental hearing on September 10, 1990, during which he heard testimony from Colvard and a vocational expert. Following the hearing, the ALJ issued a written order denying benefits on the grounds that Colvard was not disabled and could perform other jobs in the national economy. Again, the Appeals Council refused to review the ALJ's decision, and it became the final decision of the Secretary on November 21, 1991. Colvard

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

59 F.3d 165 (Table)                                                    Page 2

59 F.3d 165 (Table), 1995 WL 371620 (4th Cir.(Va.))
**Unpublished Disposition**

**(Cite as: 59 F.3d 165, 1995 WL 371620 (4th Cir.(Va.)))**

appealed the ALJ's decision to the district court in June, 1993, and the district court affirmed the ALJ's decision, finding that it was supported by substantial evidence. Colvard appeals the district court's ruling.

Colvard urges this court to reverse the Secretary's ruling on four grounds of alleged error. First, Colvard contends that the ALJ did not fully develop the record regarding his mental impairment. Second, Colvard argues that the ALJ did not fully develop the record regarding his residual functioning capacity. Third, Colvard contends that the ALJ erred in not relying upon Dr. Nelson's report. Finally, Colvard argues that the ALJ's hypothetical question posed to the vocational expert did not accurately characterize his mental illness.

If substantial evidence exists to support the Secretary's finding that Colvard is not disabled, then we must affirm the Secretary's ruling. *Mickles v. Shalala,* 29 F.3d 918, 923 (4th Cir.1994); 42 U.S.C. § 405(g) (1988). Substantial evidence is evidence that a reasonable person would accept as sufficient to support a particular conclusion. *Id.* "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir.1966).

II.

First, Colvard contends that the ALJ did not fully develop the record regarding his mental impairment. Colvard notes that Dr. Nelson found him clinically retarded, and that Dr. Hogan's report also supports the existence of a mental impairment. Colvard claims that the ALJ erred in not ordering an Intelligence Quotient ("IQ") test to determine if he suffered from some mental impairment.

**2 A review of Dr. Hogan's report reveals that he did not find any mental impairment, and the ALJ chose to accept Dr. Hogan's report rather than Dr. Nelson's report. [FN1] The ALJ was not required to order an IQ test of Colvard because the claimant bears the burden of putting forth all evidence of his mental impairments. 20 C.F.R. §§ 404.1512(a),

416.912(a) (1994). Colvard could have elected to take an IQ test at any time during the pendency of these proceedings. Furthermore, the fact that Colvard worked for sixteen years demonstrates that his IQ does not prevent him from working because a per son's IQ generally remains constant, and Colvard has not presented any evidence that some event occurred causing his IQ to diminish.

Colvard next argues that the ALJ did not fully develop the record regarding his residual functioning capacity. The ALJ found that Colvard can perform the exertional requirements of light work, [FN2] and light work usually encompasses the lesser category of sedentary work. [FN3] Colvard contends that in order to classify him as able to do light work, the ALJ must find that he is able to meet the exertional demands of both light and sedentary work. Colvard argues that the evidence establishes that he is unable to sit for the duration typically required of sedentary work. Colvard also contends that the ALJ erred in not obtaining a form assessing his residual functional capacity from a physician.

The determination of a claimant's residual functioning capacity lies with the ALJ, not a physician, and is based upon all relevant evidence. 20 C.F.R. §§ 404.1545(a), 404.1546, 416.945(a), 416.946 (1994). We find that the Secretary's conclusion that Colvard is able to perform light work is supported by substantial evidence. Even if Colvard could not perform sedentary work, he would still not be disabled because he would be able to perform light work, excluding sedentary work, and he is only disabled if he is not capable of performing *any* type of work which exists in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a) (1994). If a person can do light work, he or she can also do sedentary work, "unless there are additional factors such as ... inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b) (1994). Therefore, classifying Colvard as capable of performing light work was appropriate, even if he cannot do sedentary work.

Next, Colvard argues that the ALJ erred in relying

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

59 F.3d 165 (Table), 1995 WL 371620 (4th Cir.(Va.))
**Unpublished Disposition**

**(Cite as: 59 F.3d 165, 1995 WL 371620 (4th Cir.(Va.)))**

upon Dr. Hogan's report because Dr. Nelson administered the Minnesota Multiphasic Personality Inventory ("MMPI"), and Dr. Hogan did not conduct any formal testing.

The ALJ could not reconcile Dr. Nelson's report with Dr. Hogan's report, and because neither physician was Colvard's treating physician, the ALJ was not required to accord more deference to one than the other. We find the ALJ's decision to rely upon Dr. Hogan's report rather than Dr. Nelson's report was not an abuse of discretion because Dr. Hogan's report is consistent with the record as a whole and with Colvard's testimony, while Dr. Nelson's report is contrary to both in many respects. The MMPI testing does not affect the weight accorded to Dr. Nelson's report because Dr. Nelson never interpreted the results in light of Colvard's personality. The MMPI is not like an IQ test where the score directly documents the person's level of intellectual functioning. Rather, the MMPI is merely a diagnostic tool, and its results are not a definitive diagnosis or a psychological profile of an individual. Ann Anastasi, *Psychological Testing* 500-07 (5th ed.1982).

**\*\*3** Finally, Colvard argues that the ALJ's hypothetical question posed to the vocational expert did not accurately characterize his mental illness. Colvard claims that the question should have contained a reference that he often experiences deficiencies with concentration, persistence, and pace resulting in failure to complete tasks in a timely manner. The ALJ did indicate on the Psychiatric Review Technique Form that Colvard often experienced deficiencies with **concentration, persistence,** and **pace;** however, this statement merely reflects the ALJ's conclusion, and we find that the **hypothetical** properly included all of the limitations discussed in Dr. Hogan's report.

Colvard also contends that the ALJ's question erroneously stated that he was seriously limited, but not precluded from dealing with work stresses because Dr. Hogan's report concluded that he had a moderate to severe Dysthymic Disorder. However, after diagnosing Colvard with moderate to severe

Dysthymic Disorder, Dr. Hogan stated that the functional limitation of such a disorder is that Colvard is seriously limited, but not precluded from dealing with work stresses, functioning independently, and understanding and carrying out complex job instructions. Therefore, we find that the ALJ's question properly characterized Colvard as "seriously limited, but not precluded," as opposed to having a moderately severe impairment to deal with work stresses. The ALJ used the exact language used by Dr. Hogan in his report.

For the foregoing reasons, we find that the Secretary's decision is supported by substantial evidence and affirm the Secretary's ruling.

*AFFIRMED*

> FN1. The ALJ was entitled to rely upon Dr. Hogan's report instead of Dr. Nelson's report for the reasons discussed below.

> FN2. The Code of Federal Regulations provides:
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm leg controls.
> 20 C.F.R. §§ 404.1567(b), 416.967(b) (1994).

> FN3. The Code of Federal Regulations provides:
> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.
> 20 C.F.R. §§ 404.1567(a), 416.967(a)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

59 F.3d 165 (Table)

59 F.3d 165 (Table), 1995 WL 371620 (4th Cir.(Va.))
**Unpublished Disposition**

**(Cite as: 59 F.3d 165, 1995 WL 371620 (4th Cir.(Va.)))**


(1994).

59 F.3d 165 (Table), 1995 WL 371620 (4th
Cir.(Va.)), Unpublished Disposition

### Briefs and Other Related Documents (Back to top)

• 1994 WL 16048715 (Appellate Brief) Appellant's
Brief (May. 01, 1994)Original Image of this
Document (PDF)

• 1994 WL 16048714 (Appellate Brief) Brief for
Appellee (Jan. 01, 1994)Original Image of this
Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

168 F.3d 484 (Table)                                                Page 1

168 F.3d 484 (Table), 1998 WL 911719 (4th Cir.(W.Va.))
**Unpublished Disposition**

**(Cite as: 168 F.3d 484, 1998 WL 911719 (4th Cir.(W.Va.)))**

c

**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
Gary W. YOHO, Plaintiff-Appellant,
v.
COMMISSIONER OF SOCIAL SECURITY,
Defendant-Appellee.
No. 98-1684.

Submitted: Oct. 30, 1998.
Decided: Dec. 31, 1998.

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling. Frederick P. Stamp, Jr., Chief District Judge. (CA-97-109-5).

Karl E. Osterhout, Robert Peirce & Associates, Pittsburgh, Pennsylvania, for Appellant.

James A. Winn, Chief Counsel, Region III, Patricia M. Smith, Deputy Chief Counsel, Adam Trevor Ackerman, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania; William D. Wilmoth, United States Attorney, Helen Cambell Altmeyer, Assistant United States Attorney, Wheeling, West Virginia, for Appellee.

Before MURNAGHAN, NIEMEYER, and

MICHAEL, Circuit Judges.

**OPINION**

PER CURIAM:

**\*\*1** Gary Yoho appeals the district court's order adopting the report and recommendation of a magistrate judge, granting summary judgment to the Commissioner, denying Yoho's motion for summary judgment, and affirming the Commissioner's decision denying his application for disability insurance benefits. Yoho, who alleges he is disabled due to severe depression, contends the administrative law judge ("ALJ") did not give appropriate weight to the medical evidence and did not ask complete hypothetical questions. Finding no reversible error, we affirm.

Yoho was born in September 1951 and has a high school equivalent education. His past relevant work experience includes security guard, carpenter, plumber, and estimator. In August 1992, he suffered a sharp pain in his upper back while moving a heavy gate during his employment as a security guard. He suffered some disc degeneration, but no herniation. Yoho did not return to work and has not engaged in substantial gainful employment since that time. He alleged that he began to suffer severe depression due to his physical impairments.

Dr. Bromley, a psychiatrist, examined Yoho in August and September 1994. Bromley concluded at the end of the August examination that Yoho was 100% temporarily disabled due to his depression. Bromley observed that Yoho carried an angry demeanor and was irritable due to a belief that he was mistreated and victimized by prior employers and the workers' compensation system. According to Bromley, Yoho's depression was caused by his continued unemployment and his chronic pain.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

168 F.3d 484 (Table)                                                                      Page 2

168 F.3d 484 (Table), 1998 WL 911719 (4th Cir.(W.Va.))
**Unpublished Disposition**

**(Cite as: 168 F.3d 484, 1998 WL 911719 (4th Cir.(W.Va.)))**

Bromley also observed that Yoho's thoughts are "logical and goal directed, there is no [evidence] of a thought disorder, likewise there's no evidence of delusionality, referential thinking or paranoia." Bromley further observed that Yoho's intelligence is "grossly average.... His attention and concentration are adequate and his memory for short term registery and short term recall is within normal limits.... His insight is fair and his [judgment] is preserved."

Dr. Semidei, a psychiatrist, examined Yoho on one occasion and concluded that he suffered from "Major Depression--moderate." Semidei declined to offer an opinion as to the extent of Yoho's incapacity.

At the request of the ALJ, Frank Eibl, M.A., of Behavioral Associates, P.C., examined Yoho on one occasion. Eibl rated Yoho's ability to deal with the public and work stresses and to demonstrate reliability as "poor or none." He noted that Yoho's depression was due in part to the pain Yoho was experiencing. Like Semidei, he found that Yoho suffered from moderate major depression.

In his objective findings, Eibl concluded that Yoho had notable levels of depression and despair, social withdrawal and somewhat impaired long and short term memory. In his narrative, Eibl stated that Yoho was alert and spontaneous, maintained eye contact, displayed a positive attitude, interacted appropriately, and manifested adequate insight. Eibl also stated that Yoho demonstrated a sad demeanor with depressed levels of self-confidence and self-esteem. He also became easily frustrated if a task became too difficult.

**\*\*2** The ALJ found that Yoho had not engaged in any substantial activity since August 1992, did not have an impairment or combination of impairments listed under 20 C.F.R. Pt. 404, Subpt. P, App. 1, but was unable to perform his last relevant work. The ALJ also found that Yoho had the residual functional capacity to perform light work, due to his physical limitations, but not work that could not accommodates light limitations in social interaction, work pace, or stress tolerance.

The ALJ found Yoho did not suffer from disabling pain and noted it was reported that Yoho exaggerated symptoms of pain. The ALJ also noted that Yoho had long gaps in his work history and opined that, given he was receiving workers' compensation benefits, he lacked motivation to be employed.

The ALJ rejected the medical opinions describing significant mental health limitations because they were inconsistent with the underlying medical evidence. The ALJ noted that Bromley's and Eibl's opinions were "disproportionate with [their] clinical findings." The ALJ found that Yoho's depression went untreated, was not attended by a marked disturbance in sleep or appetite, and did not manifest suicidal or homicidal tendencies. In addition, the ALJ observed that Yoho maintained personal grooming and hygiene. Based upon a series of hypotheticals posed to a vocational expert ("VE"), the ALJ concluded that there are a significant number of jobs Yoho could perform with his physical and mental limitations including alarm monitor, information clerk, and production inspector. The Appeals Council denied Yoho's request for review.

We review the Secretary's final decision to determine whether it is supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C.A. § 405(g) (West Supp.1998); *Hays v.Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990). Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S.389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S.197, 229 (1938)). Yoho contends that the ALJ did not give appropriate weight to the medical opinion regarding his depression. Yoho also contends that the ALJ's findings were not based on accurate hypotheticals. [FN*]

A physician's opinion may be accorded less weight if it is not supported by clinical evidence or if it is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

168 F.3d 484 (Table)

168 F.3d 484 (Table), 1998 WL 911719 (4th Cir.(W.Va.))
**Unpublished Disposition**

**(Cite as: 168 F.3d 484, 1998 WL 911719 (4th Cir.(W.Va.)))**

internally inconsistent. *See Craig v. Chater,* 76 F.3d 585, 590 (4th Cir.1996); 20 C.F.R. §§ 404.1527(c)(2), 416.927 (1996). There is substantial evidence to reject Bromley's and Eibl's opinions on the basis that their conclusions are not supported by their own findings. Bromley's own observations of Yoho do not demonstrate that the depression was disabling. He observed that Yoho's thoughts were in order, that his attention and concentration were adequate, and that he had fair insight and judgment. Likewise, Eibl observed that Yoho had a positive attitude and that he was alert and cooperative.

**\*\*3** Yoho also contends that the ALJ was obligated to include her stated limitations as recorded in the **Psychiatric Review Technique** Form ("PRTF") in her **hypotheticals** to the VE. At step three of the sequential five-step analysis found at 20 C.F.R. § 416.920 (1996), the ALJ is required to complete the PRTF in order to assess a claimant's mental impairment in categories identified as the "paragraph B" criteria of § 12.00 of the Listing of Impairments. The ALJ indicated that Yoho "often" had deficiencies of concentration, persistence orpace, resulting in failure to complete tasks in a timely manner. At the hearing, the ALJ's hypotheticals referred to Yoho's deficiencies as slight.

The ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment and fairly set out the claimant's impairments. *See English v. Shalala,* 10 F.3d 1080, 1085 (4th Cir.1993); *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir.1989). There is no obligation, however, to transfer the findings on the PRTF verbatim to the hypothetical questions. The ALJ found Yoho slightly limited in his ability to deal with others in a work setting, to cope with stresses, and to maintain a consistent pace at work. This finding is supported by the evidence and is not contradictory to the ALJ's notation on the PRTF. Thus, we find that the ALJ's hypotheticals were supported by the evidence and fairly set out Yoho's impairments.

Based on the foregoing, we affirm the district court's order. We dispense with oral argument because the facts and legal contentions are adequately presented in the material before the court and argument would not aid the decisional process.

*AFFIRMED*

> FN\* Yoho limits his appeal solely to issues concerning his depression. He does not challenge the ALJ's findings regarding any physical disabilities.

168 F.3d 484 (Table), 1998 WL 911719 (4th Cir.(W.Va.)) Unpublished Disposition

**Briefs and Other Related Documents (Back to top)**

• 98-1684 (Docket) (May. 13, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.