**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**


DOUGLAS J. CORBETT,

        **Plaintiff,**

v.                   **CIVIL ACTION NO. 1:04CV241**
                                    **(Judge Keeley)**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        **Defendant.**


## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on December 13, 2004, the Court referred this Social Security action to United States Magistrate John S. Kaull with directions to submit proposed findings of fact and a recommendation for disposition. On February 23, 2006, Magistrate Kaull filed his Report and Recommendation and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the Report and Recommendation. On March 1, 2006, plaintiff, Douglas J. Corbett, through counsel, Alan J. Nuta, filed objections to the Magistrate's Report and Recommendation.

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

### I.  **PROCEDURAL BACKGROUND**

On January 13, 1993, Douglas J. Corbett ("Corbett") filed his first application for Disability Insurance Benefits ("DIB") which the Commissioner denied initially and on reconsideration. No appeal was filed and the May 23, 1993 opinion became the final decision. On July 14, 1994, Corbett filed another application for DIB which the Commissioner denied initially and on reconsideration. At a hearing on January 4, 1996, Corbett informed the ALJ that he did not wish to pursue his claim. Accordingly, on February 20, 1996, the ALJ dismissed the claim.

Thereafter, on April 6, 1996, Corbett filed another claim for DIB which the Commissioner initially denied. No appeal was filed and the June 6, 1996 opinion became the final decision. On December 6, 1996, Corbett filed another claim for DIB and also concurrently filed a claim for Social Security Income ("SSI"). The Commissioner denied both claims initially and on reconsideration. No appeal was filed; therefore, the October 2, 1997 determination became the final decision.

On June 17, 1999, Corbett filed the current application for DIB, which alleges disability as of May 1, 1995 due to a missing disc in his mid-back, chronic degenerative joint disease in the

2

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

left knee, hearing problems with chronic infection in the middle ear cavity and mastoid, and chronic post traumatic stress syndrome disorder ("PTSD"). On December 10, 2001, Corbett filed an application for SSI alleging disability since June 1, 1991, due to left knee problems, back pain and PTSD. On November 2, 1999, the Commissioner initially denied the applications and, on November 23, 1999, denied the claims on reconsideration.

Corbett appealed these decisions and, on August 29, 2000, an Administrative Law Judge ("ALJ") held a hearing. On September 21, 2000, the ALJ determined that Corbett was not disabled.

Corbett appealed and by order dated March 17, 2003, the Appeals Council vacated the September 21, 2000 unfavorable decision and remanded the DIB and SSI claims to the ALJ for further proceedings with instructions to evaluate Corbett's subjective complaints, mental impairments, residual functional capacity ("RFC") and to obtain the testimony of a vocational expert ("VE").

On June 16, 2003, pursuant to the Appeals Council's remand, an ALJ held an administrative hearing at which Corbett and a VE appeared and testified. On July 8, 2003, the ALJ found Corbett was not precluded from performing the jobs identified by the VE, absent his abuse of drugs.

3

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

On October 15, 2004, the Appeals Council denied Corbett's request for review, making the July 8, 2003 decision the final decision. On December 7, 2004, Corbett filed this action seeking review of the final decision.

## II.   PLAINTIFF'S BACKGROUND

At the time of the onset of his disability, Corbett was forty-one years old, had a high school education and past work experience as a school bus monitor, a truck driver and a laborer. He is a veteran with no combat experience and served in the United States Army from 1973-1975. In 1995, he lost his job as a school bus driver due to a positive random drug test.

## III.   ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found:

1.   Corbett met the disability insured status requirements of the Social Security Act on his alleged date of disability onset and continued to meet those requirements through June 30, 1999, but not thereafter;

2.   Absent credible evidence to the contrary, Corbett has not engaged in disqualifying substantial gainful activity since May 1, 1995, his alleged date of disability onset;

3.   Corbett has severe impairments due to the residuals of an ACL injury to the left knee, status post multiple knee

4

surgeries, including total knee replacement in June 2001; eustachion [sic] tube dysfunction with mild sensorineural hearing loss, status post ear tubs [sic]; low average to borderline intellectual functioning; post traumatic stress disorder (non-combat but military related); and polysubstance abuse with continued use of marijuana;

4.  Considering Corbett's substance abuse disorder, the severity of his mental impairments meet the criteria of section 12.09 of Appendix 1, Subpart P of Social Security Regulations No. 4 and has precluded him from working for at least 12 continuous months. Therefore, Corbett is disabled within the meaning of the Social Security Act;

5.  Considering only the impairments that would remain if Corbett stopped smoking marijuana, there is no remaining impairment or combination of impairments that meets or medically equals the criteria of any of those contained in Appendix 1;[1]

6.  Corbett's allegations regarding his impairments, including pain, and their limitations on his ability to work, are not totally credible;

7.  Considering only the impairments and limitations that remain if Corbett stopped smoking marijuana, he would have the residual functional capacity to perform the exertional requirements of at least unskilled sedentary work, lifting and carrying no more than 10 pounds, standing and/or walking at least two hours out of eight and sitting at least six hours out of eight, provided he has the opportunity to alternate sitting and standing at his discretion (sit/stand option); and the performance of work that does not involve complex/detailed tasks due to

---

[1]    42 U.S.C. § 423(d)(2)(C) provides: **(C)** An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

his intellectual functioning; or any close interaction with the general public thus minimizing his contact with the public;

8.  Corbett is unable to perform any of his past relevant work;

9.  Corbett is a "younger individual age 45-49." He was a "younger individual age 18-44" at the time of his alleged date of disability onset. He has a "limited" education;

10. Corbett's past work experience ranges from unskilled to semi-skilled in nature. In view of his age and residual functional capacity, transferability of skills is not an issue in this case;

11. If Corbett were capable of performing a full range of sedentary work, a finding of "not disabled" would be reached by direct application of Medical-Vocational Guidelines Rules 201.19, 201.20, 201.25 and 201.26. Strict application of the above-cited rules is not possible, however, as Corbett has additional exertional (sit/stand option) and non-exertional mental limitations and restrictions which narrow the range of work he is capable of performing;

12. Considering Corbett's age, education, past work experience and residual functional capacity if he were to stop his drug abuse, he would be able to make a successful adjustment to work as a surveillance [sic] system monitor and sedentary assembler that exists in significant numbers in the national economy. Therefore, a finding of "not disabled" is reached within the framework of the above-cited medical-vocational rules (20 CFR 404.1520(f) and 416.920(f));

13. The remaining limitations, if Corbett stopped smoking marijuana, would not be disabling;

14. Corbett's substance abuse is a contributing factor material to the finding of his disability as of May 1, 1995; and

15.  Corbett was not under a "disability," as defined in the Social Security Act, as a matter of law, at any time through the date of this decision, much less on or before June 30, 1999, the date his disability insured status expired, and benefits are not compensable under the Social Security Act as amended by the terms of Public Law 104-121. Therefore, his disability does not entitle him to benefits under the Social Security Act and Regulations.

### IV.   PLAINTIFF'S OBJECTIONS

Corbett objects to the report and recommendation alleging that

the ALJ:

1.  failed to properly question the VE because he did not include every limitation listed in his decision;

2.  failed to properly analyze Corbett's daily activities by ruling "that a claimant could perform in the competitive economy to the same extent as he could perform in the structured setting of a therapy program; and

3.  failed to properly evaluate and weigh the opinions of treating medical sources.

### V.   MEDICAL EVIDENCE

The medical evidence of record included:

1.  A March 6, 1990 report from Joel Andrew Mason, M.D., indicating treatment on July 25, 1988 for a June 24, 1988 high-pressure injection injury to his left calf muscle. Dr. Mason noted that Corbett walked with a normal gait, walked well on his heels and toes, had a good range of motion in all peripheral joints, and had "convalesced nicely from his injury and had no permanent disability resulting from any injuries sustained at the time of that accident;

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

2.    A February 20, 1991 report from Robert S.    Neff, M.D., indicating treatment for a "severe twisting injury to [Corbett's] left knee." Dr. Neff diagnosed a torn anterior cruciate ligament, prescribed a brace and exercise program and a referral to Lawrence M.    Shall, M.D., a specialist in knee ligament reconstruction medicine;

3.    A March 4, 1991 report from Lawrence M. Shall, M.D. indicating Corbett elected to have knee surgery;

4.    An August 10, 1992 report from Dr.    Shall indicating Corbett had fluid "built up" in his knee which he aspirated;

5.    An August 13, 1992 report from Dr.    Shall indicating swelling of the knee and a diagnosis of neuroma of the infrapatellar branch of the lesser saphenous nerve.    Treatment included an injection of zylocaine followed by an injection of cortisone and a recommendation for continued therapy. Dr.    Shall noted Corbett had not reached maximum medical benefit;

6.    A January 18, 1993 report from Dr.    Shall indicating Corbett had neuroma surgery and was "going to rehabilitation";

7.    An April 29, 1993 report from Dr. Shall indicating Corbett had achieved maximum medical benefit and requesting approval for a work hardening program and a work capacity evaluation;

8.    An August 10, 1993 report from Sheldon L.    Cohn, M.D., to Liberty Mutual Insurance Company indicating Corbett was post ACL reconstruction and status post saphenous nerve resection and had knee swelling and pain. Dr. Cohn aspirated approximately 35 ccs of amber colored clear liquid from the knee and injected Lidocaine and Aristospan;

9.    An October 15, 1993 report from Curtis V. Spear, Jr., M.D., indicating he aspirated Corbett's knee and injected it with Aristospan.   Dr.   Spear   indicated   that   an   x-ray   revealed   no significant joint narrowing;

10.  A June 6, 1994 report from Dr. Shall indicating a "greater than a 20 percent permanent impairment of his [Corbett's]

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

left lower extremity" due to several knee surgeries" and that
Corbett qualified "for assistance and disability";

11. An August 17, 1994 report from Dr. Shall indicating an
ongoing left knee problem that had been treated surgically and
recommending the he be "vocationally trained for a sedentary job".
Dr. Shall indicated Corbett's ability to climb, lift and walk were
severely restricted but that he could perform a "limited amount of
lifting, walking and climbing";

12. A May 15, 1995 x-ray of Corbett's abdomen indicating
sigmoid diverticulosis and no other diagnostic abnormalities;

13. A May 22, 1995 report from Dr. Shall indicating no
swelling and mild tenderness on the medial joint line and a
diagnosis of "post anterior cruciate ligament reconstruction with
some mild saphenous neuritis and some patellofemoral pain." Dr.
Shall recommended continued physical therapy and use of his home
TENS unit. Dr. Shall noted Corbett continued to work as a bus
driver;

14. An August 15, 1995 report from Veterans Administration
Medical Center in Hampton, Virginia, ("Hampton VAMC") indicating
complaints of being homeless, unemployed and depressed with
"thoughts of suicide". Treatment included occupational therapy,
kinesiotherapy, Ativan, and Lorazepam;

15. An August 31, 1995 report from Hampton VAMC indicting
approval of residency in a Hampton VA domiciliary;

16. A September 1, 1995 report from Hampton VAMC indicating
a diagnosis of alcohol and marijuana dependency and dysthymia,
prescriptions for Piroxicam, Thiamine, and folic acid and noting
that Corbett was compliant and employable;

17. A September 13, 1995 psychological intake evaluation from
the Hampton VAMC indicating within normal limits orientation to
time, place and person, verbal comprehension, intellectual
development, visual memory, spatial organization, visual motor
integration and concentration and mildly impaired immediate memory
span and retention of verbal material. The report further indicated
extreme subjective depressive feelings, moderate depression, marked

brooding, extreme somatic complaints, moderate conflict with
authority, extreme social alienation, marked hypersensitivity,
extreme persecutory ideation, extreme lack of ego mastery, "high
positive" for alcoholism and "marked" for post-traumatic stress
disorder symptomatology. The diagnosis was major depression with
psychotic features or Schizoaffective Disorder, "unresolved sexual
trauma issues may contribute to some of his affective and
relational problems, as well as conflicts about sexual identity",
trouble modulating anger, feelings of inadequacy and limited
insight. The recommendation was monitoring of suicidal ideation and
psychotic symptoms and evaluation for psychotropic medication;

18. A September 25, 1995 overall treatment plan from Hampton
VAMC indicating an admission to a four-week intensive outpatient
substance abuse treatment program;

19. A September 26, 1995 evaluation from Hampton VAMC
indicating diagnoses of Axis I - alcohol and cannabis dependence;
Axis II - no diagnosis; Axis III - S/P surgeries on left knee with
residual neuropathy in left leg, S/P surgery on left ear for hole
in ear drum, and right ear infection; Axis IV - unemployed and
homeless as psychosocial stressors; and Axis V - GAF of seventy
(current) and eighty (as highest level in past year);

20. An October 27, 1995 x-ray from Hamptom VAMC indicating
postoperative and mild degenerative changes of the left knee;

21. A November 29, 1995 report indicating ear surgery for
insertion of a tube in the right ear drum;

22. A January 12, 1996 note from David R. Wall indicating
Corbett was fearful of leaving VAMC and HCHV because he did not
want to return to being homeless and unemployed. Wall noted:

> He is very concerned about his ability to
> work, having basically decided he cannot
> although I think this is related to his desire
> for SSDI. He went to appeals hearing last wk
> but it was not held because he has worked in
> the past 12 mos. It was rescheduled for 4-95
> after he has been unemployed x12 mos.
> Therefore he cannot be placed in RTF as he

would be required to look for work. He has
elected to try to get into rehabitat. I wrote
consult to rehabitat on 1/11. He has been
dropped from further eval by CWT as according
to report from Ms. Shorter his work, although
reliable, was much too slow for him to make
any money thru CWT. He is a very obsessive
person with high anxiety. He reports that he
feels the meds are helping him to be more
relaxed and less depressed.

23.  A January 17, 1996 report from Robert Sandstrom, M.P.A.,
an addiction therapist with the Veterans Administration, indicating
Corbett graduated from "Aftercare" and had "been an open and honest
participant of all group sessions with a good record of
attendance";

24.  A January 21, 1996 VA Physical Medicine Rehabilitation
Progress Report indicating Corbett successfully met the program's
goals for his cannabis dependency and alcohol abuse;

25.  A January 23, 1996 MHC – General Progress Note from Mary
K. Sweeney, a clinical nurse specialist at Hampton VAMC, indicating
Corbett was in early remission for his alcohol and cannabis
dependency. Ms. Sweeney also indicated that "he is less anxious and
his sleeping is markedly improved" since he has been taking
Sertraline but that he is still quite concerned about his future
and is still hoping to get into Rehabitat;

26.  A February 22, 1996 rehabilitative progress report from
Sarah L. Semones, MS, RM, CS, Hampton VAMC indicating Corbett
reported that he had lost his last job as a school bus driver in
Norfolk City public schools due to a positive random drug test;
that he had experienced PTSD due to a "voluntary homosexual
experience while stationed in Germany with the Army"; that his knee
injury and subsequent surgeries continued to cause pain and
limitations; that he had accepted a settlement from Liberty Mutual
Insurance Company for his knee injury; that he had applied for and
been denied Social Security disability benefits; that he intended
to reapply for Social Security benefits and, if awarded benefits,
work part time to supplement his Social Security income. Semones
noted that Corbett tended to "minimize his drug use and

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

rationalized the use of marijuana because it helped him sleep". Corbett reported his medical conditions included chronic ear pain related to fluid, chronic knee pain related to injury, surgery, and fluid and migraine headaches and that his goals were to obtain "housing in the Warwick SRO", be awarded Social Security benefits, work part time at the VAMC, and "get his head straight".

The impression was Axis I – marijuana dependence, "ETOH dependence," and dysthymia; Axis II – deferred; Axis III – irritable bowel, chronic knee pain, chronic ear pain, migraine headaches; Axis IV – homeless and unemployed; and Axis V – GAF 60;

27. A May 17, 1996, report from Judith Carey, LCSW, indicating Corbett successfully completed all components of the ReHabitat Program and was accepted by the VASH-Hud program sponsored by the VA.  Carey indicated that Corbett participated once a week in group therapy that focused on "the management of self in relationships with others." She noted that Corbett was initially somewhat negative and hopeless but with time he was able "to verbalize some  awareness of the impact of the negative thinking on others and on his own behavior";

28. A May 17, 1996 report from Donald P. Smith, a VA psychology technician, and James Robinson, a VA staff psychologist, indicating:

> This veteran was admitted to Rehabitat on 2/5/96. He was initially case managed by Sarah Semones. However, upon her leaving the program, the veteran was then assigned to my case load. It became very evident that this veteran appeared to be looking for long term housing. He did address his long history of substance abuse (marijuana). He was able to see that he had a problem, but appeared to want to blame others for most of his substance abuse issues, as well as some of his other living issues. The veteran was informed of his original discharge date, 5-6-96, early on in his treatment and this was not a problem. However, it became apparent that he had not planned for this. He was trying in every way

12

he could think of to attempt to stay in the
DOM system. The veteran had been told to save
up his money in preparation for discharge.
However, when I took over his case, he
informed me that he spent most of his money in
repairing his automobile. It is well
documented in the progress notes as to what
happened in this turn of events. The final
result is that he was discharged today from
Rehabitat and the DOM. He plans to continue
working his I.T. assignment, await his NCS
claim and live in his automobile;

29. A June 3, 1996 Psychiatric Review Technique from Sreeja
Kadakkal, M.D., indicating an affective disorder of dysthymia,
substance addiction disorders, a slight degree of limitation in
activities of daily living, moderate degree of limitation in
maintaining social functioning, seldom experienced limitations in
concentration, persistence, or pace and one or two episodes of
deterioration or decompensation. Dr. Kadakkal noted no functional
limitation that satisfied a listing;

30. A June 3, 1996 Mental Residual Functional Capacity
Assessment from Dr. Kadakkal indicating no significant limitation
in the ability to: 1) remember locations and work-like procedures;
2) understand and remember short and simple instructions; 3) carry
out very short and simple instructions; 4) maintain attention and
concentration for extended periods; 5) perform activities within a
schedule; 6) maintain regular attendance; 7) be punctual within
customary tolerances; 8) sustain an ordinary routine without
special supervision; 9) work in coordination with or proximity to
others without being distracted; 10) make simple work-related
decisions; 11) complete a normal workday and workweek without
interruptions from psychologically based symptoms; 12) perform at
a consistent pace without an unreasonable number and length of rest
periods; 13) ask simple questions or request assistance; 14) accept
instructions and respond appropriately to criticism from
supervisors; 15) get along with coworkers or peers without
distracting them or exhibiting behavioral extremes; 16) maintain
socially appropriate behavior; 17) adhere to basic standards of
neatness and cleanliness; 18) respond appropriately to changes in
the work setting; 19) be aware of normal hazards and take

13

appropriate precautions; 20) travel in unfamiliar places or use public transportation; and 21) set realistic goals or make plans independently of others. Dr. Kadakkal indicated moderate limitation in the ability to: 1) understand and remember detailed instructions; 2) carry out detailed instructions; and 3) interact appropriately with the general public. Dr. Kadakkal also indicated that Corbett "maintains the ability to do simple work";

31. A June 4, 1996 Residual Physical Functional Capacity Assessment from Carolina B.  Longa, M.D., indicating Corbett could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour work day, had unlimited ability to push/pull and had no postural, manipulative, visual, communicative, or environmental limitations;

32. A June 19, 1996 progress note from Keith M.  Austin, LCSW, VA social worker, indicating that Corbett reported that his lawyer had informed him he was "dropping his [Social Security] case because all Dr. statements indicate that he is able to work";

33. A July 18, 1996, report from Hamptom VAMC indicating the treatment provided from September 1, 1995 through July 18, 1996. The report indicated a diagnosis of alcohol dependency, marijuana dependency, and dysthymia. It further noted that Corbett had completed his placement in the Rehabitat Program and the Substance Abuse Treatment Program, which was part of the Domiciliary Homeless Program, was "competent for VA purposes", employable, and could undertake activity as tolerated. At discharge, his medications were Trazodone, Butalbital/Acetaminophen, and plain Tylenol;

34. An August 15, 1996 psychology general progress note indicating Corbett began biofeedback treatment at Hampton VAMC;

35. A September 23, 1996 psychology general progress note from Leonard Holmes, Ph.D., psychologist, indicating Corbett "appeared to be making some progress reducing EMG in most biofeedback sessions." Holmes noted that they discussed Corbett's headaches and possible PTSD symptoms;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

36. An October 15, 1996 progress note from Marsha J. Turner, Psychology Technician, and Pamela A. Knox, staff psychologist, indicating Corbett participated in the first session of the "Coping with Pain Group" at Hampton VAMC and "was an active participant";

37. An October 15, 1995 progress note from Marsha J. Turner, Psychology Technician, and Leonard Holmes, Ph.D, Staff Psychologist, indicating Corbett was seen for biofeedback;

38. A November 4, 1996 report from Pamela A. Knox, PSY D., indicating Corbett had participated in four sessions of the Hampton VAMC's "Coping with Pain Group." The sessions included discussions regarding diet, weight and pain medication. Knox noted that Corbett rated his pain as a 7 on a scale of 0 to 10;

39. A December 31, 1996 office note from Leonard Holmes, Ph.D, indicating biofeedback and noting skin conduction increased from 4.3 to 5.1;

40. A January 14, 1997 office note from Leonard Holmes, Ph.D, indicating that Corbett appeared to have made progress; that his pain was a "'7' on a scale of 1-10 most days"; and that he had decreased his use of narcotics;

41. A January 29, 1997 office note from Kathy Gradeles, psychology technician, indicating Corbett cancelled his biofeedback appointment because he had been involved in an automobile accident;

42. A February 3, 1997 x-ray report from Riverside Health System indicating "changes of previous anterior cruciate ligament repair," but otherwise negative left knee;

43. A February 10, 1997 report from a consultative examination by Gerry N. Smith, M.D., indicating a chief complaint of decreased salary and decreased ability to work and complaints of poor vision and left knee pain. Dr. Smith noted that Corbett appeared to be talkative, cooperative, alert, and oriented "X3", had "patchy decreased sensation to light touch over the medial surface of [his] left thigh," left knee, and proximal left calf region, had mild atrophy distally of the left quadriceps muscles, had 5/5 strength proximally and distally of the lower extremities, 4/5 strength of left knee flexion and extension, had normal range

of motion in his hips, ankles, and right knee, had full active range of motion in his left knee for flexion with "-5 degrees from full with left knee extension", had a mild impairment as it was mildly antalgic with decreased full and total weight on the left leg, was able to "take steps up on his toes as well as back on his heels within normal limits" and hop on his left and right legs within normal limits. Dr. Smith's summary indicated that Corbett was status post left knee injury and at least three knee surgeries with persistent discomfort and decreased functioning of left knee, had some peripheral superficial sensory nerve damage as a result of one of the knee surgeries, had hearing and audiologic dysfunction which the VA rated at 10% disability, and history of alcohol and marijuana use and dysthymic disorder;

44.  A February 25, 1997 Physical Residual Functional Capacity Assessment from Carolina B. Longa, M.D., indicating Corbett could occasionally lift and/or carry twenty pounds, could frequently lift and/or carry ten pounds, could stand and/or walk for about six hours in an eight-hour workday, could sit for a total of about six hours in an eight-hour workday, had unlimited push/pull, could frequently climb ramps and stairs, could occasionally balance, stoop, kneel, crouch, and crawl, could occasionally climb ladders, ropes, and scaffolds and had no manipulative, visual, communicative, or environmental limitations;

45.  A February 26, 1997 office note from Dr. Holmes indicating Corbett had biofeedback and indicating no injuries or pain from the automobile accident but was experiencing increased headaches;

46.  A March 5, 1997 Psychiatric Review Technique from Stonsa Insinna, Ph.D., indicating Corbett had no restriction of activities of daily living, a slight degree of limitation in maintaining social functioning, seldom demonstrated a degree of limitation in concentration, persistence or pace and had experienced one or two episodes of deterioration or decompensation;

47.  A March 5, 1997 Mental Residual Functional Capacity Assessment from Dr. Insinna indicating no significant limitation in the following abilities:  1) remember locations and work-like procedures;  2) understand and remember short and simple instructions;  3) carry out very short and simple instructions;  4)

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

maintain attention and concentration for extended periods; 5)
perform activities within a schedule; 6) maintain regular
attendance; 7) be punctual within customary tolerances; 8) sustain
an ordinary routine without special supervision; 9) work in
coordination with or proximity to others without being distracted;
10) make simple work-related decisions; 11) complete a normal
workday and workweek without interruptions from psychologically
based symptoms; 12) perform at a consistent pace without an
unreasonable number and length of rest periods; 13) ask simple
questions or request assistance; 14) accept instructions and
respond appropriately to criticism from supervisors; 15) get along
with coworkers or peers without distracting them or exhibiting
behavioral extremes; 16) maintain socially appropriate behavior;
17) adhere to basic standards of neatness and cleanliness; 18)
respond appropriately to changes in the work setting; 19) be aware
of normal hazards and take appropriate precautions; 20) travel in
unfamiliar places or use public transportation; 21) interact
appropriately with the general public; and had moderate limitation
in his ability to 22) understand, carry out, and remember detailed
instructions and 23) set realistic goals or make plans
independently of others. Dr. Insinna noted:

> Mr. Corbett's progress through the phases of
> the Domiciliary Homeless Program and SA tx
> indicates he is able to engage in and perform
> at least simple and routine, basis work. Mr.
> Corbett is to be commended for engaging in
> this program lasting almost one year. with the
> idea that he continues his sobriety he should
> be an asset to the community, being able to
> have a productive life;

48. A March 14, 1997 office note from Dr. Holmes indicating
Corbett was discharged from the Chronic Pain Program at Hampton
VAMC but was to continue to be followed by the psychology portion
of the program;

49. A March 27, 1997 office note from Dr. Holmes indicating
a biofeedback treatment;

50. An April 8, 1997 office note from Patricia Temple,
I.T.C., indicating Corbett returned to his "Incentive Therapy

17

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Assignment," sponsored by the Hampton VAMC after an extended sick leave;

51. An April 8, 1997 report from Priscilla B. Hankins, M.D., of the Incentive Therapy Assignment group indicting a drug and alcohol history of daily use of marijuana for years and that his last use of marijuana was "two days prior to this appt". Dr. Hankins diagnosed "PTSD, Chronic, Cannabis Dependence, Chronic Knee pain, recurrent otitis media and frequent headaches." Dr. Hankins recommended referral to SATP, continuation of AA meetings, a trial of Paxil 20 mg in the a.m. and a follow-up appointment in one month. Dr. Hankins noted that Corbett stated that "he felt he could stop drug use on us own." Dr. Hankins advised Corbett to abstain from drug use and "he vowed to do so";

52. A May 6, 1997 office note from Dr. Holmes of the Hampton VAMC, indicating that Corbett was "hopeful about a new job he applied for recently" and was "feeling calmer since beginning a new medication";

53. A May 22, 1997 report form Marinell Miller, Ph.D, of the VAMC Post Traumatic Stress Disorder Clinical Team indicating an evaluation of "PTSD-related complaints." Dr. Miller noted that Corbett was cooperative and goal directed, had logical speech and his "thought processes were intact without evidence of psychosis." Dr. Miller observed that Corbett's thought content contained "intrusive thoughts of sexual and relationships [sic] matters". Dr. Miller further noted that Corbett denied suicidal or homicidal ideation, plan, or intent, his mood was "non-depressed and anxious with mood congruent affect" and his insight and judgment were intact.

Dr. Miller diagnosed: Axis I – PTSD, chronic with impact on social and vocational function and polysubstance abuse; Axis II – none; Axis III – ENT difficulties and left knee problems; Axis IV – unemployed, chronic PTSD symptoms, and past trauma; and Axis V – GAF was 50 and stated that Corbett met "full criteria for PTSD and is recommended for enrollment in the PCT Clinic";

54. A May 30, 1997 progress note from Patricia Temple, I.T.C., indicating that on May 27, 1997 Corbett tested positive for cannabinoids and was removed from the Incentive Therapy Program at

18

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Hampton VAMC. Temple informed Corbett that he could return to his IT position in thirty days provided he submitted to a urine drug screen. Corbett reported being under a lot of pressure lately because his father was sick and his mother had been in an automobile accident. Temple closed the case subject to reopening;

55. A June 6, 1997 progress note from Dr. Holmes indicating biofeedback. Dr. Holmes noted that Corbett reported increased concern regarding his physical health because of increased shoulder pain and moles. Corbett felt that his physicians were "missing something" and expressed concern about having cancer. Dr. Holmes further noted that Corbett appeared to be "motivated to begin the PTSD program next week";

56. A July 31, 1997 progress note from Marsha J. Turner, psychology technician, indicating a biofeedback session. Turner noted that Corbett reported he had not had any headache pain in the past two weeks;

57. An August 21, 1997 progress note from Priscilla B. Hankins, M.D., indicating Corbett reported a positive therapeutic response to Paxil and that he was less anxious, sleeping better, and did not "pace the floors." Corbett also reported that "keeping busy and attendance at the educational classes on PTSD help him as well." Examination revealed no psychosis or suicidal or homicidal ideation and intact insight and judgment. Dr. Hankins recommended continuation of paxil, PCT Education Group and a follow-up appointment;

58. A September 25, 1997 notation that A. A. Douglas Moore, M.D., reviewed and affirmed the February 25, 1997, Physical Residual Functional Capacity Assessment of Dr. Longa;

59. A November 7, 1997 medical record from Carlson M. Pendleton, a licensed clinical social worker at Hampton VAMC, indicating that Corbett reported he had "not been able to track down the record of his rape." Corbett presented about eight letters that he had written to various agencies in an attempt to find the report he completed at the time of the incident; none of the government agencies were able to come up with the report. Corbett stated that he thinks that "perhaps it was destroyed rather than sent forward";

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

60. A November 11, 1997 medical record indicating Corbett completed a thirteen-week PTSD Group Education Session at Hampton VAMC;

61. A June 10, 1998 progress note from Bevan Yuen, physician, indicating an ear evaluation with a diagnosis of allergic rhinitis, chronic serious otitis media and tinnitus. Dr. Yuen prescribed Vancenase and amoxicillin and directed Corbett to stop using aspirin;

62. A September 25, 1998 progress note from J. James Rooks, Jr., M.D., indicating a diagnosis of chronic eustachian tube dysfunction and bilateral high frequency sensory neural hearing loss. Dr. Rooks noted that Corbett did not want the insertion of "T tubes" at this time and that he had "done his best" to care for his ears as he had "stopped drinking . . . [and] does not smoke." Dr. Rooks ordered an evaluation in one year;

63. A December 14, 1998 progress note from Norman E. Wear, chaplain, and Linda K. McKendry, social worker, and John D. Perz, social worker, indicating screening for domiciliary acceptance and noting that his rehabilitation potential and substance abuse status were questionable. It was decided that a "clarification of rehab potential and ATC assessment" would need to be made before deciding the appropriate level of care;

64. A December 23, 1998 progress note from Robin A. Sutton, BSW for Addictions, indicating Corbett reported he had been in recovery for alcohol for the "last four years," but found his addiction to marijuana "not a major problem in his life. His last use was a few weeks ago." Corbett stated: "I can take it or leave it." The assessment was "veteran does not meet DSM-IV criteria for addictions treatment. The plan included an invitation to attend weekly group therapy;

65. A January 4, 1999 progress note from Norman E. Wear, a Veterans Administration chaplain, indicating Corbett's participation in the "DCHV outpatient clinic for three weeks" and that he had done well and had been admitted to the domiciliary "pending bed availability";

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

66.  A January 13, 1999 progress note from Mark M. Abrams, nurse practitioner, noting admission to a VAMC domiciliary in Portland, Oregon. The diagnosis indicated hearing loss and left knee pain, swelling and stiffness, depression, a history of intermittent dysthymia, a history of PTSD related to a "male rape in military", alcohol abuse in full remission, THC abuse, homelessness and unemployed and dental problems. The treatment plan included "[p]articipation in DCHV," management of his medical problems, and laboratory tests. Corbett was medically cleared for "IT, . . . employment in the community, physical activities in 'DCHV,' . . . Recreational Therapy, Physical Fitness Training, Housekeeping Assignments";

67.  A January 15, 1999 chest x-ray from VAMC in Tacoma Washington, indicating no acute cardiopulmonary disease and lung changes consistent with a history of smoking;

68.  A January 19, 1999 a Rehabilitation Care Plan from James T. Burke, indicting goals of obtaining housing, generating income, saving money, developing skills for interdependence, developing and maintaining a substance abuse recovery program, improving mental health by addressing the symptoms of rage and isolation, and improving physical health;

69.  A January 21, 1999 progress note from Robin Sutton, BSW, CDSII – Addictions, Addiction Treatment Center at the VAMC, in Portland, Oregon indicating Corbett appeared "to be motivted [sic] to change present living and coping patterns and continue substance free lifestyle and become a self-supporting and contributing member of community." The diagnosis was Axis I – alcohol dependence {full remission}, cannabis dependence {early remission}; Axis II – history of intermittent dysthymia and PTSD; Axis III – otitis media, tinnitis, and degenerative joint disease; Axis IV – problems related to homelessness, occupational problems, and economic problems; and Axis V – GAF 50;

70.  A March 12, 1999 progress note from Mark M. Abrams, a nurse practitioner at Portland VAMC, indicating "renewed symptoms of PTSD, including difficulty sleeping, nightmares, and constant thoughts about the previous trauma." Corbett requested "transfer to a PTSD in-patient treatment program." Abrams instructed him to

confer with "the CRT" on March 15, 1999, for an evaluation and prescribed Trazodone for the sleeplessness;

71. A March 17, 1999 progress note from Mark M. Abrams, a nurse practitioner, indicating acceptance into the PTSD program scheduled to begin in three weeks and noting that the Trazodone was helping him sleep "solidly all night";

72. A March 30, 1999 progress note from Winston E. Johnson, a Health Technician at Portland VAMC, indicating that Corbett had begun his daily PTSD group sessions and weekly substance abuse program;

73. An April 21, 1999 progress note from Margarita Hope, RN BSN, indicating admission into a domiciliary at Portland VAMC residual support unit and noting Corbett had been alcohol free for five years and his last use of marijuana was in December;

74. An April 21, 1999 evaluation from Glenn Ehlig, Physician Assistant, indicating a diagnosis of Axis I – anxiety disorder with PTSD symptoms, cannabis dependence (continuous in early remission), and alcohol dependence (full remission); Axis II – "R/O personality disorder or features, NOS"; Axis III – chronic eustachian tube dysfunction, high-frequency sensori neural hearing loss, history of chronic otitis media, history of chronic tinnitus, status post left anterior cruciate ligament reconstruction, mild left knee degenerative arthritis, hyperlipidemia, and loss of T8-9 disk space; Axis IV – homelessness, unemployed, history of traumatic event while in military; and Axis V – GAF of 40;

75. An April 23, 1999 thoracic spine x-ray from VAMC Tacoma, Washington, indicating "almost complete loss of disk space at T9-10, congenital vs. acquired";

76. A May 7, 1999 discharge summary indicating Corbett transferred to the White City Domiciliary, located in White City, Oregon;

77. A May 12, 1999 report from an "Addiction Severity Index" interview by Gerald Otis, a staff psychologist at the White City VAMC, indicating Corbett indicated that he had never been treated for alcohol or drug abuse and that he had been "bothered

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

considerably by psychological or emotional problems in the month prior to [the] interview" but that he considered "treatment for psychological or emotional problems to be not at all important". Based on this interview, Dr. Otis determined that Corbett had medical problems with a severity of 7, psychiatric problems with a severity of 6, and zero severity of employment, alcohol, or drug problems;

78. A May 12, 1999 mental health screening by a nurse at White City VAMC, indicating Corbett reported that his sleep had been restless during the past week; that he felt hopeful about the future and that he had been bothered by repeated, disturbing memories during the past month related to his PTSD;

79. A May 17, 1999 evaluation from Dr. Otis indicating a diagnoses of Axis I – post-traumatic stress disorder and cannabis dependence, Axis II – features of histrionic personality disorder, Axis IV – psychosocial and environmental problems: homeless, low income, unemployed and Axis V – GAF of forty-five. Dr. Otis recommended referral to Recreation Service, a consult with a substance abuse counselor, and reevaluation of his anxiety medications;

80. A May 19, 1999 report from a physical examination at the White City VAMC indicating a "history of chronic otitis bilateral with eustachian tube function and hearing loss . . .," "recent onset of dizziness and vertigo . . .," "[p]robable post traumatic arthritis, left knee . . .,"and "recent onset of pain posterior aspect of neck." Physical examination revealed normal head and neck, eyes, throat, mouth, chest, lungs, cardiovascular, abdomen, neurological, and skin, a "PET tube" in the left ear, scarring in his right ear, septal deviation in left nostril, a cyst-like lesion of right testicle, two hemorrhoids, "tenderness to palpation . . . over lumbosacral spine" but no tenderness, lordosis, kyphosis or scoliosis and full range of motion of the back. The impressions were: alcohol dependence (in remission), polysubstance dependence (primarily marijuana and continuous), homeless, PTSD by history, bilateral chronic otitis media and eustachian tube, hearing loss by history, recent onset of dizziness and vertigo, questionable sustained hypertension, post traumatic arthritis of left knee, dental disease, symptomatic external hemorrhoids, diverticulosis by history, and recent onset of neck pain;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

81.  A June 8, 1999 a Thoracic spine x-ray from White City VAMC indicating the T9-10 intevertebral bodies were congenitally fused and that other disc space was well preserved. An x-ray of his left knee showed "orthopedic hardware, screw fragments, in the tibia and femur", "degenerative joint disease involving the medial compartment of the knee and "synovial calcification";

82.  A June 22, 1999 report from Richard L. Swanson, M.D., indicating that an ENT examination and a diagnosis of chronic bilateral tubotympanitis in the right ear. Dr. Swanson prescribed Septra and recommended a follow-up appointment in two weeks;

83.  A July 6, 1999 physician's note from Lawrence B. Inderbitzen, M.D., at White City VAMC, indicating an evaluation of Corbett's PTSD medication regimen.  Dr.  Inderbitzen prescribed Paroxetine and discontinued the Hydroxyzine;

84.  A July 6, 1999 report from to Dr.  Swanson indicating a follow-up examination of Corbett's right ear.  Dr.  Swanson noted that the "[r]ight serous otitis media [had] improved, but middle ear effusion remains.  CBT still present and functioning left ear." Dr. Swanson continued the Septra and scheduled a return appointment in two weeks for a "right myringotomy and CBT placement";

85.  A July 20, 1999 report from Dr.  Swanson indicating a "myringotomy with aspiration and insertion of CBT" on Corbett's right ear. Dr.  Swanson continued the prescription for Septra and prescribed Cortisporin Otic Suspension drops;

86.  A July 20, 1999 orthopedic consultative examination report from William E.  Matthews, M.D., regarding Corbett's left knee. Examination revealed Corbett could "rise on the toes and heels" and flex forward and reach his feet. The diagnosis was joint arthritis, continued pain, collapsing, moderate loss of motion, neuroma,  chronic  synovitis,  and  posttraumatic  degenerative arthritis. Dr. Matthews noted that the ligament stability appeared to be satisfactory and further noted that the left knee symptoms were "probably significantly worsened by chronic tension and/or depression";

87.  A September 22, 1997 Psychiatric Review evaluation from Dr. Kadakkal indicating an anxiety related disorder in the form of

chronic PTSD resulting in a slight limitation in his activities of daily living, a moderate limitation in maintaining social functioning, seldom being limited in concentration, persistence, and pace and one or two episodes of deterioration or decompensation. Dr. Kadakkal noted that Corbett was "capable of doing simple work";

88. A September 22, 1997 Mental Functional Capacity Assessment from Dr. Kadakkal indicating that Corbett was slightly limited in his ability to:  1) remember locations and work-like procedures; 2) understand and remember short and simple instructions; 3) carry out very short and simple instructions; 4) maintain attention and concentration for extended periods; 5) perform activities within a schedule;  6) maintain regular attendance; 7) be punctual within customary tolerances; 8) sustain an ordinary routine without special supervision; 9) work in coordination with or proximity to others without being distracted; 10) make simple work-related decisions; 11) complete a normal workday and workweek without interruptions from psychologically based symptoms; 12) perform at a consistent pace without an unreasonable number and length of rest periods; 13) ask simple questions or request assistance; 14) accept instructions and respond appropriately to criticism from supervisors; 15) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 16) maintain socially appropriate behavior; 17) adhere to basic standards of neatness and cleanliness; 18) respond appropriately to changes in the work setting; 19) be aware of normal hazards and take appropriate precautions; 20) travel in unfamiliar places or use public transportation; and 21) set realistic goals or make plans independently of others. Dr. Kadakkal noted moderate limitation in Corbett's ability to: 1) understand and remember detailed instructions; 2) carry out detailed instructions; and 3) interact appropriately with the general public;

89. An October 29, 1999 Residual Functional Capacity Assessment from J. Scott Pritchard, D.O., indicating Corbett could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, had unlimited ability to push/pull, could frequently climb ramps and stairs and balance, could

occasionally climb ladders, ropes, scaffolds, stoop, kneel, crouch and crawl. Dr. Pritchard found Corbett had no manipulative, visual, communicative, or environmental limitations. Dr. Pritchard noted, after review of all of the medical records, that Corbett's impairments did not meet a listing and that there was "nothing further in file that would reduce or alter the RFC";

90.  An October 29, 1999 Psychiatric Review Technique Form, from Bill Hennings, Ph.D., indicating "depression NOS", PTSD "by history" and substance addiction disorder for alcohol and cannabis dependence (in remission). Dr. Hennings noted that Corbett had slight limitation in his activities of daily living, had moderate limitation in maintaining social functioning, was often limited in his concentration, persistence, or pace and that there was insufficient evidence to conclude if Corbett had ever experienced episodes of deterioration or decompensation;

91.  An October 29, 1999 mental residual functional capacity from Dr. Hennings indicating Corbett was not significantly limited in his ability to: 1) remember locations and work-like procedures, 2) understand and remember very short and simple instructions, 3) carry out very short and simple instructions, 4) perform activities within a schedule, 5) maintain regular attendance, 6) be punctual within customary tolerances, 7) sustain an ordinary routine without special supervision, 8) make simple work-related decisions, 9) complete a normal work day and workweek without interruptions, 10) perform at a consistent pace without an unreasonable number and length of rest periods, 11) ask simple questions or request assistance, 12) accept instructions and respond appropriately to criticism from supervisors, 13) get along with coworkers or peers, 14) maintain socially appropriate behavior, 15) adhere to basic standards of neatness and cleanliness, 16) respond appropriately to changes in the work setting, 17) be aware of normal hazards and take appropriate precautions, and 18) travel in unfamiliar places. Dr. Hennings found Corbett was moderately limited in his ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods of time, to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, and to set realistic goals or make plans independently. Dr. Hennings noted that:

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

---

Clmt is capable of understanding, remembering
and carrying out simple work instructions but
may have occasional difficulties in detailed
tasks. Clmt is capable of completn [sic] a
normal    workday/workweek    wihtout    [sic]
excessive interruptions due to psych based sx.
Clmt should not work in areas that require
freq contact with gen public but clmt is
capable of routine contact with coworkers.
Clmt does not require special supervision;

92.  A November 22, 1999 notation from Dick Wimmers, Ph.D.,
indicating he had reviewed and affirmed Dr. Hennings's October 29,
1999, Psychiatric Review Technique and Mental Residual Functional
Capacity Assessment;

93.  A November 23, 1999 notation from Dr. L. Jenseum
indicating he had reviewed and affirmed the October 29, 1999,
report of Dr. Pritchard;

94.  A June 6, 2000 learning disability assessment from Edwin
E. Pearson, Ph.D., a psychologist, at the request of Mr. Harrison,
VA vocational counselor, to develop "appropriate educational and
vocational goals" Dr. Pearson indicated:

Toward the end of his enlistment, he reports
that another Army man made sexual advances
that he should not have allowed. This occurred
on only one occasion. Douglas claims he was
quite naive and, before he knew it, he was
involved in sexual activities that were
unfamiliar and disturbing. The very next day
he reported the incident to his superiors. He
was transferred to another base, and from his
perspective nothing really came of it.
Douglas would like to have seen the man
punished. In any event, the incident was
unsettling for Douglas, and to this day he has
many unresolved feelings around that
experience.

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Dr. Pearson administered a battery of tests including the Wechsler Adult Intelligence Scale, Wechsler Memory Scale, Wide Range Achievement Test, Gates-MacGintie Reading Tests and the Minnesota Multiphasic Personality Inventory. Following a one and one-half hour diagnostic interview, Dr. Pearson diagnosed: Axis I – chronic post-traumatic stress syndrome, pain disorder associated with psychological factors, and history of alcohol and cannabis dependence in full remission; Axis II – borderline intellectual functioning; Axis III – medical problems; Axis IV – psychosocial and environmental problems; and Axis V – GAF of sixty-five. Dr. Pearson noted:

> In summary, Douglas is a 46-year old man of borderline intelligence. Academic testing consistently falls in the borderline range, with the exception of one score on a measure of reading for speed and accuracy. Other than this relatively weak score, reading comprehension, decoding of individual works, spelling and math skills all fall around the lower fifth to seventh grade level. It seems unlikely that this is a man who is going to appreciably improve academic skill levels. He does not appear to this writer to have a specific learning disability but rather borderline intellectual functioning, which does impose limitations on academic skill development. Douglas has been employed in the past mainly involved in heavier physical labor. It would certainly be reasonable to assume that this individual will be able to return to some kind of competitive employment in the future, especially if he remains clean and sober. It would be better to involve this type of man in more hands-on training than to assume that much headway will be made in attempting to improve academic skills through formal education;

95. A July 28, 2000 report from Gerald D. Otis, Ph.D., psychologist, indicating he reviewed Dr. Pearson's evaluation and indicated:

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

> While Dr. Pearson believed Doug could be
> trained in some "hands-on" occupation, his
> back condition is likely to restrict the
> number of those competitive employment
> situations which would be available to him.
> Because of potential liability, employers tend
> to not want to take risks on individuals with
> back problems. It is conceivable there might
> be some employment niche which Doug can fill
> if allowances were made for his disabilities,
> but the chances of him finding one that would
> pay enough for him to live on are slight.  It
> seems likely to me that the patient will need
> some kind of subsidy in order to remain viable
> in the community.  I also disagree with Dr.
> Pearson's GAF estimate of 65. I had earlier
> (see Psychological Assessment shortly after
> patient entered the Domiciliary) given the
> patient a GAF rating of 45, and after seeing
> his test results, would shave a few point off
> that. The patient's willingness to work is
> admirable and efforts should be made to locate
> that rare niche he might fit into, but the
> likelihood of him being able to survive in the
> community without assistance is nil, in my
> opinion;

96. An August 8, 2000 left knee x-ray from VA Domicilary,
White City Oregon, indicating "[d]egenerative change" in the form
of chondromalasic changes, degenerative spurring, joint space
narrowing, and calcification within the cartilaginous tissue;

97. An October 31, 2000 Mental Residual Functional Capacity
from Dr. Otis indicating no significant limitation in the ability
to ask simple questions or request assistance, moderate limitation
in the ability to: 1) remember locations and work-like procedures;
2) understand and remember very short and simple instructions; 3)
carry out very short and simple instructions; 4) complete a normal
workday and workweek without interruptions from psychologically
based symptoms and to perform at a consistent pace without an
unreasonable number and length of rest periods; 5) interact

29

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

appropriately with the general public; 6) accept instructions and
to respond appropriately to criticism from supervisors; 7) get
along with co-workers or peers without distracting them or
exhibiting behavioral extremes; 8) be aware of normal hazards and
take appropriate precautions; and 9) travel in unfamiliar places or
to use public transportation and marked limitation in the ability
to: 1) understand and remember detailed instructions; 2) carry out
detailed instructions; 3) maintain attention and concentration for
extended periods; 4) perform activities within a schedule, maintain
regular attendance and be punctual within customary tolerances; 5)
sustain an ordinary routine without special supervision; 6) work in
coordination with or proximity to others without being distracted
by them; 7) make simple work-related decisions; 8) respond
appropriately to changes in the work setting; and 9) set realistic
goals or to make plans independently of others.  Dr.  Otis noted
that these limitations lasted or were expected to last for twelve
months and that the onset of the limitations was "3 yrs. ago";

98.  A January 3, 2001 report from Kelly D. Krohn, M.D., staff
physician, from Portland VAMC, indicating complaint of left knee
pain.  Examination revealed a small effusion of the left knee, but
no warmth, diaphoresis, or blotching.  Diagnosis was "chronic knee
pain."  Dr. Krohn prescribed an injection of Lidocine and Marcaine
and scheduled a diagnostic arthroscopy;

99.  A January 3, 2001 x-ray from VAMC Portland of Corbett's
knees   indicating   left   knee   degenerative   changes,   left
patellofemoral joint degenerative change, postoperative left knee,
left knee joint effusion and a relatively unremarkable right knee;

100. A January 30, 2001 report from Thomas Harrison, a
vocational rehabilitation counselor with the Department of Veterans
Affairs, in Portland, Oregon, indicating:

> Given this veteran's work history, education,
> present level of academic functioning, impact
> of his service-connected and workers comp
> injuries, I believe that he would be hard
> pressed to compete for the vast majority of
> jobs in the local labor market in southern
> Oregon.  He is precluded, in my opinion, from
> all employment that he has held previously

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

---

> given the physically demanding nature of these
> job descriptions.  His academic abilities,
> presently, would make it difficult for him to
> compete for positions that are within his
> physical capacities.  I also believe that this
> veteran would probably be hard pressed to work
> on a full time basis;

101. A February 1, 2001 operation report from John B.  Reid,
III, M.D., indicating a diagnostic arthroscopy of the left knee.
Dr. Reid observed "three compartment end stage osteoarthritis with
intact anterior cruciate ligament". Dr. Reid recommended Corbett
added to the list for a left total knee arthroplasty;

102. A May 7, 2001 report from John Jackson, M.D., indicating
hearing and knee problems. Examination of revealed scarred tympanic
membranes and no significant wax and knee pain with simple range of
motion.  The diagnosis was hearing loss, tinnitus, vertigo, post-
traumatic arthritis of the left knee, mid-thoracic back pain due to
"missing disc" and PTSD. Dr.  Jackson referred Corbett to an
orthopedist and an ears-nose-throat doctor. Corbett asked Dr.
Jackson about medicating his conditions with "medical marijuana";
Dr.  Jackson, however, "declined to consider prescribing it under
these circumstances."  Dr.  Jackson prescribed Paxil;

103. A June 7, 2001 report from Sean Traynor, M.D., indicating
complaints of bilateral hearing loss, ear disease and dizziness.
Dr.  Traynor noted that both ear canals were clear and that the
tympanic membranes were slightly dull and sluggish but were intact
without atelectasis.  Dr.  Traynor reviewed Plaintiff's audiogram
and noted "severe, symmetric, centrally flat sensorineural hearing
loss with a possible small conductive component at the lower
frequencies."  Speech discrimination was one-hundred percent and
his hearing level was "80 dB". Dr.  Traynor also noted that the
hearing loss was "likely contributing to the tinnitus" and that
there was no active, chronic, or acute  infection of his ears.  Dr.
Traynor recommended the placement of "PE tubes" and intended to
schedule the procedure "over the next couple weeks";

104. A June 13, 2001 report from Richard E.  James, M.D., of
Southern  Oregon  Orthopedics,  indicating  a  referral  from  Dr.
Jackson. Examination revealed pain when he squatted; "0 to 110

degrees range of motion; 3- effusion of the knee; 4+ patellofemoral crepitus and patellofemoral pain with compression; 4+ mid and posteromedial joint line tenderness; 2+ mid and posterolateral joint line tenderness." X-rays revealed "almost complete loss of the medial compartment with significant periarticular osteophytes around the medial compartment; also similar changes in the patellofemoral compartment." The assessment was "posttraumatic arthritis of the left knee." Dr. James noted that he informed Corbett that, if he chose to have knee replacement surgery, he "would only keep him off work for the normal rehabilitation time following knee replacement." Dr. James scheduled a "left total knee replacement";

105. A June 20, 2001 report from Dr. Traynor indicating that he performed a "bilateral myringotomy and tubes";

106. A July 3, 2001 operation report from Dr. James indicating he performed left knee replacement surgery at Providence Medford Medical Center;

107. A July 6, 2001 discharge report from Providence Medford Medical Center indicating "left knee showed excellent position of his total knee replacement arthroplasty on x-ray" and instructions to attend outpatient physical therapy and return to Dr. James in ten to twelve days;

108. A July 16, 2001 report from Dr. James indicating a follow-up appointment after left knee replacement surgery. Examination revealed passive motion was "10 to 90 degrees" and active motion was "15 to 80 degrees." Dr. James instructed Corbett to "work hard on his quadriceps and hamstring progressive resistance exercises . . . as well as posterior capsular and hamstring stretching", to continue with physical therapy and return to Dr. James in four weeks;

109. An August 3, 2001 report from Dr. Traynor indicating "good relief in his right ear fullness following placement of the PE tube but believe[d] . . . the fullness in his left ear has returned." Examination revealed both ear canals were clear and right tympanic membrane was healthy. Dr. Traynor noted the left ear canal revealed inflammation and a protruding PE tube. Dr. Traynor prescribed Cortisporin drops;

110. An August 12, 2001 report from Dr. Traynor indicating the right ear was normal, the left ear revealed erythema and edema around the external auditory canal and eardrum;

111. An August 17, 2001 report from Dr. James indicating Corbett was "doing fine" following the left total knee replacement. Examination revealed a range of motion of "10 to 90 degrees", no valgus/varus instability, no anterior/posterior stability, and a well-healed incision. The x-ray revealed "excellent position of the total knee replacement . . . on all views." Dr. James instructed Corbett to continue physical therapy and return in two months;

112. An August 30, 2001 report from Dr. Traynor indicating complaints of "perceived fullness in his left ear", imbalance and occasional "popping of the left ear." Examination revealed ear canals were clear, a "mildly atelectatic" left tympanic membrane and no middle or external ear infections;

113. A September 25, 2001 report from Dr. Traynor indicating a left myringotomy and "T tube" placement;

114. An October 12, 2001 report from Dr. James indicating Corbett was "happy with his result" of the knee replacement. Examination revealed a range of motion of "0 to 110 degrees" with no effusion and excellent stability and alignment. Dr. James noted Corbett was making good progress and encouraged him to continue physical therapy and exercise. Corbett requested a medication other than Lortab and Dr. James prescribed Darvocet and Vioxx;

115. An October 25, 2001 report from Dr. Traynor indicating "relief of the fullness in the left ear after the T tube was placed" and continued feeling of imbalance. Examination revealed that the ear canals were clear, tympanic membranes were healthy, and "patent tube bilaterally." Dr. Traynor diagnosed bilateral serous otitis media, which was resolved by tube placement, and disequilibrium and recommended a repeat electronystagmongram;

116. A November 12, 2001 report from Jeffrey Rice, M.S., an audiologist with Dr. Traynor's office, indicating complaints of intermittent floating feeling, head pressure, tinnitus, and possible orthostatic hypotension. Mr. Rice noted the electronystagmongram was "noncontributory." Mr. Rice stated "[h]is

33

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

symptoms may be due to high-frequency vestibular abnormality, other postural related systems (somatosensory or vision), or psychological issues";

117. A November 14, 2001 report from Mr. Rice indicating complaints of intermittent floating feeling, head pressure, tinnitus and orthostatic hypotension. Audiological testing revealed no abnormalities and Mr. Rice again stated that the symptoms could be caused by "high-frequency vestibular dysfunction, central vestibular abnormalities, postural related systems (somatosensory or vision), or psychological issues;

118. A January 11, 2002 report from J. W. Jackson, M.D. to Kathleen Quick of Medford Disability Services indicating the results of an administrative medical examination. Musculoskeletal examination revealed swelling at left knee with no tenderness, full extension of about "160" and near normal flexion. Dr. Jackson's assessment was: 1) "history of injury and subsequent to the left knee with left total knee replacement surgery performed six months ago"; 2) tinnitus, dizziness, hearing loss; 3) history of lower thoracic back pain and "a missing disk"; 4) and PTSD. Dr. Jackson stated:

> This patient's balance difficulties and his orthopedic problems would preclude him from doing heavy physical work or work requiring agility and good balance. He should not work on ladders or at height. I see no contraindication to performing a sedentary job. His ongoing health problems involving his knees, ears and psychological disorder are all under treatment at this time.

119. A March 4, 2002 report from Dr. James indicating Corbett was walking but was not performing "the other exercises he needs for his quadriceps". Examination revealed positive straight leg test at about 75 degrees, range of motion of "0 to 125 degrees passively, 0 to 15 degrees actively", no valgus/varus instability, minimal effusion, no patellofemoral pain and no tenderness over the joint line. X-rays revealed excellent alignment of the knee and a slight varus position of the tibia which was not thought to be clinically significant;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

120. A March 8, 2002 Psychiatric Review Technique from Dorothy Anderson, Ph.D., indicating a non-severe anxiety-related disorder from "a history of" PTSD, mild limitation in his activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence or pace and no episodes of decompensation;

121. A March 9, 2002 notation from Dick Wimmers,, Ph.D affirming the March 8, 2002 findings of Dr. Anderson;

122. A March 11, 2002 Physical Residual Functional Capacity Assessment from Mary Ann Westfall, M.D., indicating Corbett could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of at least two hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, had unlimited ability to push/pull, could "frequently" climb ramps and stairs, could "occasionally" balance, stoop, crouch and crawl, should "never" climb ladders, ropes and scaffolds or kneel with his right knee, and had no manipulative, visual or communicative limitations but should avoid concentrated exposure to hazards;

123. A March 20, 2002 report from Dr. James indicating the results of the March 7, 2002 lumbar spine MRI. The MRI showed "far lateral protrusion of the L3-4 disk which extends into and narrows the L3-4 neural foramina on the right, mild, bilateral foraminal stenosis at L4-5 and a mild posterior disk bulge at L5-S1 with bilateral foraminal stenosis." Dr. James recommended an epidural steroid injection and noted that "[i]nterestingly a lot of his pain was more in his left leg than it was in his right";

124. An April 15, 2002 report indicating Corbett transferred to Hampton VAMC from White River VAMC. Corbett denied use of or having "a problem" with illicit drugs, denied experiencing "sexual harrassment [sic] or trauma while in the military service," and identified no barriers to his learning. Corbett reported self-medicating his PTSD symptoms (nightmares) by using marijuana. The diagnosis was low back pain, PTSD, and degenerative joint disease (bilateral knees). Treatment received included a prescription for Lodine and a referral for a mental health screening;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

125. An April 15, 2002 notation from Sharon Eder, M.D., affirming the findings in the March 11, 2002, Physical Residual Functional Capacity Assessment from Dr. Westfall;

126. An April 18, 2002 progress note from Hampton VAMC indicating Corbett was issued a cane to aid in ambulation;

127. A May 2, 2002 decision from the Veterans Administration indicating an increase for PTSD to fifty percent disabling and noting:

> This condition is evaluated as 50 percent disabling because it is likely the severity of the service-connected psychiatric disability more nearly approximates the requirements for this evaluation rather than the next lower evaluation of 30 percent or the next higher evaluation of 70 percent. Clearly the GAF scores of 45, 41, and 55 do not reflect exclusively the effects of PTSD. Instead, these include, in part, the effects of nonservice connected disability alcohol and marijuana dependence. It would appear reasonable to believe that the effects of PTSD alone would reflect a score of about 55 to 60;

128. A May 2, 2002 progress note from Brenda G. Adams, R.N., a VA psychiatric nurse clinician at Hampton VAMC, indicating:

> Veteran seen in the PCT Rapid Access clinic on 5/2/02. The veteran was referred to the clinic for re-entry after moving away from the area for several years. He reported that he has been granted 60% SC for PTSD by the regional office in Oregon, but our records still show 20%. The veteran reports that he has been having the following problems recently: increased thoughts/dreams of war zone, loss of control of anger verbally, panic that keeps veteran from daily activities, long periods of isolation, and family/significant other problems. The veteran feels the most important

> problem right now is anxiety. He was taking
> paxil until about a month ago when his
> prescription ran out. He stated, 'It helped me
> to stay calm'. He also related that he still
> smokes marijuana daily 'for medicinal
> purposes, it helps me forget what happened'.
> He was cautioned on self-medicating, but said
> that it was the only thing so far that had
> helped with the dreams and re-experiencing.

Adams recommended a return to the clinic's PTSD Education
series, a referral to a physician for medication management and
sent Corbett to the emergency room for a medication evaluation and
restart of paxil if appropriate;

129. A May 6, 2002 report from Martha Guyon, M.D., Emergent
Care psychology department of the Hampton VAMC, indicating
complaints of left knee and lower back pain. Dr. Guyon noted that
Corbett admitted that he "continued to smoke pot occasionally",
because he felt it relaxed him. Dr. Guyon strongly advised Corbett
to abstain from cannabis and noted that, although Corbett admitted
he needed to quit, his motivation was questionable;

130. A May 9, 2002 evaluation from the Hampton VAMC PTSD
treatment team recommending enrollment in a ten-week
psychoeducation class which would hopefully result in "decreased
intensity of all or some PTSD symptoms", "increased knowledge base
about PTSD symptoms" and the development of "new coping skill".
The record reflects that Corbett attend his first session on May 9,
2002, and also attended sessions on May 23 and May 30, 2002;

131. A June 6, 2002 medication evaluation for PTSD from
Naheed S. Sabir, M.D., indicating reports of PTSD symptoms
including "recurrent nightmares, flashbacks, intrusive thoughts,
social withdrawal, depressed mood, generalized anxiety, difficulty
concentrating, poor attention span, insomnia, irritability, and
nightsweats." Dr. Sabir noted these symptoms were "further
complicated by a history of substance abuse (cannabis)" and also
noted that Corbett reported undergoing rehabilitation for cannabis
use but reported using marijuana for "more than 30 years". Dr.
Sabir observed no psychotic symptoms, an anxious mood, pressured
speech with normal tone, tangential thoughts, and intact insight

and judgment. Dr. Sabir diagnosed chronic PTSD and dysthymia. He prescribed Paxil and Trazodone and recommended continuation of the PTSD education classes and psychological therapy;

132. A June 8, 2002 report from the Hampton VAMC Emergent Care facility indicating complaints of dizziness and tinnitis in both ears and a prescription for Cipro;

133. A June 10, 2002 Medical Assessment of Ability to do Work-Related Activities (Mental) from Marinell Miller Mumford, Ph.D., indicating fair ability to follow work rules and function independently, a poor ability to relate to coworkers, deal with the public, use judgment with the public, interact with supervisors, deal with stresses, maintain attention and concentration, fair ability to understand, remember, and carry out simple job instructions, poor ability to understand, remember and carry out complex job instructions and detailed, but not complex, job instructions, deficient short term memory and problems in concentration, fair ability to demonstrate reliability, poor ability to maintain personal appearance, and poor ability to behave in an emotionally stable manner and relate predictably in social situations. Dr. Mumford noted "several physical disabilities that cause impairments in his work performance. He has recently had a total knee replacement, hearing loss, low back pain, and otitis media-chronic. However, he is considered unemployable for any type of competitive work due to his psychiatric illness, PTSD and personality disorder, NOS";

134. A February 7, 2003 psychological evaluation from Dr. Mumford indicating "symptoms of profoundly disabling PTSD, which include intrusive thoughts of the traumatic event", such as repetitive (nightly) traumatic nightmares, hallucinatory flashbacks, distress "upon exposure to cues which remind him of the trauma," and extreme fears of "those of the black race." Dr. Mumford also noted "avoidance symptoms of social detachment, inability to tolerate crowds of people, estrangement from family and friends, and reluctance to talk about the trauma". Plaintiff reported he slept for two to three hours at a time. Dr. Mumford noted problems with impaired thought processes and communication, problems taking turns when talking, problems with active listening, periods of grossly inappropriate behavior, poor personal hygiene, tense and guarded logical speech, problems with tangential thought,

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

intact thought processes without evidence of psychosis, depressed
mood, and poor insight and judgment. Dr. Mumford diagnosed the
following: Axis I – chronic PTSD that impacted social and
vocational function ("unemployable"); Axis II – none; Axis III –
total knee replacement, chronic back pain with bulging L disc, T9-
T10 disc missing, vertigo, tinnitus, otitis media; Axis IV –
problems with primary support group, inadequate social support,
unemployable, housing problems, and inadequate finances; and Axis
V – GAF was forty-one; and

135. An April 28, 2003, notification from the Department of
Veterans Affairs effective December 1, 2002 indicating an increase
in monthly entitlement to $2,193.00 for an overall or combined
rating of seventy percent due to PTSD.

## VI.  **DISCUSSION**

Corbett objects to the report and recommendation, contending

that the ALJ did not properly question the VE because he failed to

include all of the limitations in the hypothetical question listed

in his opinion. Defendant contends the ALJ properly relied upon

valid expert testimony.

In <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992), the

Fourth Circuit held that, at the  fifth step of the sequential

evaluation, "the burden shifts to the [Commissioner] to produce

evidence that other jobs exist in the national economy that the

claimant can perform given his age, education, and work

experience."

20 C.F.R. § 404.1520 (f) provides:

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

> (f) *Your impairment(s) must prevent you from
> doing any other work*. (1) If you cannot do
> any work you have done in the past because you
> have a severe impairment(s), we will consider
> your residual functional capacity and your
> age, education, and past work experience to
> see if you can do other work. If you cannot
> we will find you disabled.

20 C.F.R. §404.1566(e) provides:

> *Use of vocational experts and other
> specialists*. If the issue in determining
> whether you are disabled is whether your work
> skills can be used in other work and the
> specific occupations in which they can be
> used, or there is a similarly complex issue,
> we may use the services of a vocational expert
> or other specialist. We will decide whether
> to use a vocational expert or other
> specialist.

In <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989), the Fourth

Circuit held that "[t]he purpose of bringing in a vocational expert

is to assist the ALJ in determining whether there is work available

in the national economy which the particular claimant can perform."

In <u>English v. Shalala</u>, 10 F.3d 1080, 1085 (4th Cir.1993) (<u>citing</u>

<u>Walker v. Bowen</u>, 876 F.2d 1097, 1100 (4th Cir.1989)), the Fourth

Circuit held that, when "questioning a vocational expert in a

social security disability insurance hearing, the ALJ must propound

hypothetical questions to the expert that are based upon a

consideration of all relevant evidence of record on the claimant's

impairment" and also provides that the reviewing court should consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges."

In <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir. 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. <u>See also</u> <u>Lee v. Sullivan</u>, 945 F.2d 689 (4th Cir. 1991)(noting that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record.") In <u>Edwards v. Bowen</u>, 672 F. Supp. 230, 235 (E.D.N.C. 1987), the court stated that, if the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response is binding on the Commissioner.

Here, the ALJ determined:

> The medical evidence indicates that the claimant has severe impairments as the result of anterior cruciate ligaments (ACL) injury to the left knee, status post multiple surgeries (June 1991 and December 1992), most recently a left knee replacement arthropathy in July 2001; eustachion tube dysfunction, status post ear tubes (1995, 1999 and 2001) with sensorineural hearing loss; post-traumatic stress disorder; polysubstance abuse; and low

41

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

---

> average to borderline intellectual functioning
> (full scale IQ of 75 on the WAIS-III in June
> 2000. These impairments significantly effect
> his physical ability to lift and stand/walk,
> and his mental ability to understand, remember
> and carry out complex/detailed instructions
> and tasks and to interact appropriately with
> others.

The ALJ then determined that Corbett met Listing 12.09 for
substance addiction disorders and was under a disability beginning
March 1, 1995 and continuing through the date of the decision.
Significantly, however, the ALJ further found:

> The overall evidence of record reflects,
> however, that if the claimant stopped his
> marijuana abuse, his remaining mental
> impairments, post traumatic stress disorder
> and low average to borderline intellectual
> functioning, as well as his left knee and
> bilateral ear conditions, would not meet or
> equal the criteria of any of the impairments
> listed in Appendix 1. He would have no more
> than moderate limitations on his activities of
> daily living. While he has spent much of the
> adjudication period in the VA domiciliary
> facilities due to his homeless status, the
> record reflects he was independent in personal
> care. A third party statement made in June
> 1999 (Ex. B-16E) indicates that the claimant
> goes to the movies and dances, shops and does
> the laundry, reads, drives, takes walks up to
> a half a mile, and does chores in the
> domiciliary. Furthermore, the claimant's
> description of his work in the Incentive
> Therapy program at the VA reflects that for
> one year in 1995, he sat at a desk six to
> seven hours per day, five days per week, and
> took messages. He also worked successfully as

a Senior Section Leader. Since returning to
the area in 2002, he has been able to maintain
his own household. And he indicates he used a
$20,000 back payment of VA benefits to move
back to the area. The reviewing but non-
treating psychologists with the State Agency's
Disability Determination Services have
indicated no or slight limitations on daily
living. He would have no more than moderate
limitations in social functioning. He reports
few social contacts but he was able to live in
a domiciliary at the VA for prolonged periods
of time. The reviewing DDS psychologists noted
no more than mild to moderate limitations in
social functioning. Likewise, in the area of
his ability to maintain concentration,
persistence or pace, he would have moderate
limitations. While he could not perform
complex/detailed tasks either due to his
intellectual functioning and substance abuse,
his ability to perform simple, repetitive
tasks is shown by this successful performing
in this duties in the Incentive Therapy
program. As for episodes of decompensation,
absent his substance abuse, there have been
none.

[Emphasis added]. Based on these findings, the ALJ determined:

Affording the claimant substantial benefit of
the doubt, the medical evidence supports a
finding that if the claimant had stopped
smoking marijuana, the remaining impairments
would not have been work-disabling. <u>Absent
marijuana, the claimant would have the
residual functional capacity to perform at
least unskilled sedentary work which would
allow him to alternate sitting and standing at
his discretion and would be routine and
repetitive in nature and not involve
complex/detailed tasks or close interaction
with the general public</u>. The residual

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

> functional capacity give the claimant the
> benefit of the doubt regarding his knee and
> takes into account his intellectual
> functioning and minimizes contact with the
> general public.

[Emphasis added].

Based on this RFC, at the second administrative hearing on
June 16, 2003, the ALJ posed the following hypothetical questions
to the VE:

Q.    Okay. Let me put some hypothetical questions to you
      now. For these I want you to assume you're dealing
      with a younger individual, who has a limited
      education and past work experience as described
      here today. For the first hypothetical I want you
      to assume that this individual would be limited to
      sedentary work as it's defined in the Social
      Security Regulations with further restrictions,
      then, that he would need to be able to periodically
      alternate between sitting and standing. He would
      need to avoid complex or detailed tasks. He would
      need to avoid close interaction with the general
      public. Would there be any jobs such an individual
      could perform?

A.    Yes. Jobs would include surveillance system monitor
      with 105,000 nationally, 3,000 in Virginia and
      sedentary assembler with 50,000 nationally, 1,500
      in Virginia. Those are sedentary, unskilled jobs.

Q.    Okay. If, in addition to the limitations in the
      first hypothetical, the individual would have
      problems interacting appropriately with others,
      maintaining attention and concentration for
      prolonged periods of time and would need to
      frequently, being more than once every two hours,
      elevate his leg above the waist level. Would there
      be any jobs such an individual could perform?

44

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

A.   No, sir.

Q.   Is there any difference between the way you use
     these jobs and the way they're described in the
     Dictionary of Occupational Titles?

A.   No, sir.

[Emphasis added].

As noted above, the ALJ determined that Corbett retained the RFC to perform at least unskilled sedentary work that allowed him to alternate sitting and standing at his discretion, was routine and repetitive in nature and did not involve complex/detailed tasks or close interaction with the general public. The hypothetical presented asked the VE to consider an individual who was limited to sedentary work, would be able to periodically alternate between sitting and standing, would need to avoid complex or detailed tasks and would need to avoid close interaction with the general public.

Moreover, the evidence of record, specifically the State agency reviewing psychologists reports, indicate that Corbett retained a mental RFC for simple, routine work, even considering his substance dependence and abuse. Dr. Insinna opined that Corbett "seldom" had a deficiency of concentration, persistence or pace, and would be able to engage in at least simple, routine, basic work. Dr. Kedakkal opined Corbett's ability to maintain attention,

45

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

concentration, and pace was "not significantly limited," and that he was capable of doing simple work.  Drs. Hennings and Wimmers both indicated that, even though Corbett would "often" have deficiencies of concentration, persistence or pace, he was capable of understanding, remembering and carrying out simple work.

Dr. Pearson, an examining psychologist in June 2000, determined that Corbett had only mild to moderate limitations, a GAF of 65,[2] adequate hygiene and grooming, was completely oriented and cooperative, exhibited excellent social and communicative skills, had an appropriate affect, and no evidence of obvious mood disturbance. Significantly, Dr. Pearson concluded that Corbett should be able to return to some kind of competitive employment, especially if he remained clean and sober.

It is clear, therefore, that, after careful consideration of all the evidence of record, the ALJ included all of the limitations supported by the evidence listed in his opinion in the hypothetical

---

[2]    A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

to the VE. The Magistrate Judge determined that the record contained substantial evidence to support the limitations listed in the ALJ's opinion and included in the hypothetical. The Court agrees.

**B.**

Corbett objects to the report and recommendation and contends that the ALJ failed to properly analyze his daily activities. The Commissioner contends that, based upon the evidence of record, the ALJ properly determined that, absent his alcohol and drug use, Corbett was not disabled.

The ALJ found that Corbett's limitations were mild to moderate, that he was independent in his personal care, that a third party statement indicated that he went to movies and dances, shopped and did laundry, read, drove, walked up to half a mile, and did chores in the domiciliary. Furthermore, in his own description of his work in the IT program, Corbett indicated he worked at a desk six to seven hours per day, five days per week, worked successfully as a Senior Section Leader, and maintained his own household.

The ALJ considered the reports of the State psychologists that indicated Corbett had no more than mild to moderate limitations in

47

his activities of daily living, social functioning, and ability to maintain concentration, persistence or pace. The ALJ noted that Corbett's frequent mental health treatment generally involved substance abuse. Significantly, the evidence also reflects that, when abstinent, Corbett related well to others in the domiciliary; that, when sober, he got along well with others; that he moved to Seattle to help his family manage an apartment complex; and that, when he was compliant with his medication, it had a positive effect.

Significantly, Dr. Insinna, a State agency reviewing psychologist, opined:

> Mr. Corbett's progress through the phases of the Domiciliary Homeless Program and [substance abuse treatment] indicates <u>he is able to engage in and perform at least simple and routine, basic work</u>. Mr. Corbett is to be commended for engaging in this program lasting almost one year. With the idea that he continues his sobriety he should be an asset to the community, being able to have a productive life.

[Emphasis added].

The Magistrate Judge determined that Corbett's successful work experiences during the IT program, his ability to get along with others and take care of his personal needs while in the domiciliary supported the ALJ's finding that Corbett retained the ability to

perform simple, routine work. Furthermore, the Magistrate Judge also determined that Dr. Insinna's opinion provided a substantial basis for the ALJ's decision to include the VA experience in his evaluation regarding whether Corbett could perform simple work.

Importantly, even assuming that this consideration was improper, review of the evidence clearly establishes that there are numerous medical opinions reflecting that Corbett retained the ability to perform simple routine work. Furthermore, the evidence also reflects that, whenever Corbett abstained from the use of alcohol and marijuana, he was capable of caring for his personal needs on a daily basis and engaging in appropriate social behavior.

Accordingly, the Magistrate Judge determined that the record contains substantial evidence to support the ALJ's evaluation of Corbett's daily activities. The Court agrees.

C.

Corbett contends that the ALJ failed to properly evaluate and weigh the opinions of the treating medical sources, in particular, Dr. Mumford and Dr. Otis, and the vocational rehabilitation counselor, Mr. Harrison.

Pursuant to 20 CFR § 404.1513(a), Mr. Harrison, a vocational rehabilitation counselor, is not listed as an "acceptable medical

source" under the regulations and the ALJ is not required to give great weight to, or even consider, his opinion. Mr. Harrison is, however, an "other source," listed in § 404.1513(d) and the ALJ "may" consider the opinion in making a determination. Here, the ALJ considered Mr. Harrison's opinion, but did not accord it significant weight.

In <u>Craig v. Chater</u>, 76 F. 3d 585, 589 (4th Cir. 1996), the Fourth Circuit held that "[a]lthough it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." In <u>Mitchell v. Schweiker</u>, 699 F.2d 185 (4th Cir. 1983), the Fourth Circuit held that a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." In <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992), however, the Fourth Circuit held that Circuit precedent does not require that a treating physician's testimony "be given controlling weight."

20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) both provide:

> [i]f we find that a treating source's opinion
> on the issue(s) of the nature and severity of
> [the] impairment(s) <u>is well supported by
> medically acceptable clinical and laboratory</u>

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

> <u>diagnostic techniques and is not inconsistent
> with the other substantial evidence in [the]
> case record</u>, we will give it controlling
> weight.
>
> By negative implication, if a physician's
> opinion is not supported by clinical evidence
> or if it is inconsistent with other
> substantial evidence, it should be accorded
> significantly less weight.

[Emphasis added.]

Corbett contends that the ALJ did not properly consider and afford the proper weight to the opinion of Dr. Miller-Mumford. Corbett first saw Dr. Mumford (then Dr. Miller) on May 22, 1997. At that time, Dr. Mumford opined that Corbett's mood was "non-depressed and anxious with mood congruent affect," and that his insight and judgment were intact. She diagnosed PTSD and Polysubstance Abuse, and assessed his GAF as 50 (current). He was enrolled in the PTSD clinic.

Three months later, Dr. Mumford indicated that Corbett reported continued positive therapeutic response to Paxil and that he was less anxious, sleeping better, did not "pace the floors", and that "keeping busy and attendance at the educational classes on PTSD help[ed] him as well." Dr. Mumford further noted that Corbett

51

reported no psychosis or suicidal or homicidal ideation and that his insight and judgment were intact.

Two months later, Corbett moved to the state of Washington to help family members manage an apartment complex. Prior to his departure, Dr. Mumford encouraged him to follow up with his PTSD treatment "in spite of his difficulties with finding proof of his rape." She indicated that Corbett had benefitted from treatment, that his mood was non-depressed, that his thoughts were logical, and that his insight and judgment were unimpaired.

The record reflects that Dr. Mumford did not see Corbett again until June 10, 2002 when he returned from Washington. At this time, Dr. Mumford completed a Medical Assessment of Ability to do Work-Related Activities (Mental) and noted that he had "several physical disabilities that cause impairments in his work performance" and that he was "considered unemployable for any type of competitive work due to his psychiatric illness, PTSD and personality disorder, NOS". The basis for Dr. Mumford's limitations was "group observation and individual interactions" and "problems remembering appointments and [] missed appointments due to forgetting." Significantly, Corbett later admitted he was using marijuana around the time of this evaluation.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

On February 7, 2003, Dr. Mumford completed a second psychological evaluation and noted that, prior to the completion of the ten-week psychoeducational class for PTSD at Hampton VAMC, Corbett had been treated as an inpatient for PTSD at the American Lakes VAMC for eight weeks and had participated in a twenty-four months PTSD program in 2001 at White City VAMC. Dr. Mumford indicated that Corbett presented intrusive daily thoughts of the traumatic event, repetitive (nightly) traumatic nightmares, hallucinatory flashbacks, distress "upon exposure to cues which remind him of the trauma," and extreme fears of "those of the black race." She also noted that Corbett reported "avoidance symptoms of social detachment, inability to tolerate crowds of people, estrangement from family and friends, reluctance to talk about the trauma" and only being able to sleep for two to three hours at a time.

Dr. Mumford determined that Corbett had problems with impaired thought processes and communication, problems taking turns when talking, problems with active listening, periods of grossly inappropriate behavior, was intrusive in interpersonal relationships, had poor personal hygiene and was unable to maintain cleanliness with consistency. She observed that Corbett was tense

53

and guarded with logical speech, had problems with tangential thought, had intact thought processes without evidence of psychosis, had a depressed and anxious mood, and poor insight and judgment. Her diagnosis was Axis I – chronic PTSD that impacted social and vocational function ("unemployable"); Axis II – none; Axis III – total knee replacement, chronic back pain with bulging L disc, T9-T10 disc missing, vertigo, tinnitus, otitis media; Axis IV – problems with primary support group, inadequate social support, unemployable, housing problems, and inadequate finances; and Axis V – GAF was forty-one.

Importantly, at the administrative hearing on June 16, 2003, Corbett testified he last smoked marijuana one week earlier, but he would "just burn one" with his friends occasionally. He testified:

> I do that because of medicinal purposes and it helps me. I self medicate myself sometimes, Your Honor. It's not like it's an addiction. I just have depression, anxiety. I've had all this with my PTSD and I sit back and I got these big pains coming out [inaudible] of my body.

He further stated that it had been a long time since he smoked marijuana before that, because at the VA "[he] was tested every week."

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Although the ALJ refers to Dr. Otis as a "treating Psychologist," the Magistrate Judge noted that the record indicates Dr. Otis saw Corbett on May 12, 1999, for an Addiction Severity Index interview; on May 17, 1999, for a psychological evaluation; and on July 28, 2000, to discuss Dr. Pearson's evaluation. At the Addiction Severity Index interview, Corbett reported that he had <u>never</u> been treated for alcohol or drug abuse and that he considered "treatment for psychological or emotional problems to be not at all important". After this subjective interview, Dr. Otis determined that Corbett had <u>zero</u> severity of employment, and <u>zero</u> severity of alcohol or drug problems.

On May 17, 1999, Dr. Otis conducted a mental status examination and personality testing. Corbett reported that he was fired from his last regular job as a bus driver because he tested positive for marijuana, that he began using marijuana at the age of ten and had tried cocaine "a few times, but had never used it regularly" and that he had "one 'suicide attempt'". Corbett admitted, however, that the suicide attempt occurred when he was "applying to enter the Hampton VAMC . . . and . . . had learned from other veterans that one way to avoid getting turned down for admission was to report a suicide attempt." Corbett also reported

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

that he had been "raped" while stationed in Germany in 1975, and, as a result, continued to have nightmares.

Dr. Otis made the following diagnoses: Axis I – post-traumatic stress disorder and cannabis dependence; Axis II – features of histrionic personality disorder; Axis IV – psychosocial and environmental problems: homeless, low income, unemployed; and Axis V – GAF of forty-five (R. 874). Dr. Otis recommended a referral to Recreation Service, a consult with a substance abuse counselor and a re-evaluation of the anxiety medications.

There is no error in the Magistrate Judge's determination that the opinions of Dr. Mumford and Dr. Otis failed to meet the requirement in <u>Mitchell v. Schweiker</u>, 699 F.2d 185 (4th Cir. 1983), that a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." As noted earlier, Dr. Mumford only saw Corbett for a short period of time prior to his move to Washington and noted at that time that Corbett had benefitted from treatment, had a non-depressed mood, had logical thoughts, and had unimpaired insight and judgment despite not being on any psychotropic medications.

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Thus, Corbett had improved within the six months of treatment to a point that had permitted him to move and go to work.

Four years later, Dr. Mumford, only saw Corbett a few times within an eight-month period, stating at that time that Corbett was unemployable based on her observations and a history of missed appointments. Significantly, however, Corbett later admitted that he was using alcohol and marijuana around the time of the June 2002 evaluation.

As to Dr. Otis, the record reflects that within an 18-month period he saw Corbett only two or three times and did not have the benefit of "continuing observation . . . over a prolonged period of time."

The Magistrate Judge determined that, even if these two psychologists could be considered "treating physicians", the ALJ was correct in determining that Dr. Otis' and Dr. Mumford's evaluations were not entitled to significant weight because they were not supported by nor consistent with the treatment records or other evidence of record.

The ALJ first noted a 1999 psychiatric evaluation showing no more than mild PTSD symptomology and noted that there was "essentially no psychiatric medical evidence made between 1999 and

May 2002, to show greater disability." The ALJ particularly discussed examining psychologist Dr. Pearson's report of June 2000 which was the result of a referral by Corbett's vocational counselor at the VA, Mr. Harrison.

Dr. Pearson performed a battery of tests in addition to a one and one-half hour interview. In contrast to the opinions of Dr. Mumford and Dr. Otis, he noted that Corbett had only mild to moderate limitations, a GAF of 65, had adequate hygiene and grooming, was completely oriented and cooperative, exhibited excellent social and communicative skills, had an appropriate affect, and no evidence of obvious mood disturbance. Dr. Pearson concluded that Corbett should be able to return to some kind of competitive employment, especially if he remained clean and sober.

Mr. Harrison reviewed Dr. Pearson's report and indicated that Corbett would be hard pressed to compete for the vast majority of jobs in the local labor market in southern Oregon. Dr. Otis, the staff psychologist, noted that Corbett's "back condition" would likely restrict the number of jobs in competitive employment situations which would be available to him, stating: "Because of potential liability, employers tend to not want to take risks on

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

individuals with back problems." He also noted "the chances of him finding one that would pay enough for him to live on are slight."

The Magistrate Judge determined that, pursuant to 20 CFR § 404.1566(c), the ALJ had properly found that, whether or not a claimant is actually hired, remains employed or makes a certain income is not relevant to the issue of whether a claimant is disabled for purposes of Social Security disability. 20 CFR § 404.1566(c) provides:

> We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exits in the national economy, but you remain unemployed because of
> -
> (1) Your inability to get work;
> (2) Lack of work in your local area;
> (3) The hiring practices of employers;
> (4) Technological changes in the industry in which you have worked;
> (5) Cyclical economic conditions;
> (6) No job opportunities for you;
> (7) You would not actually be hired to do work you could otherwise done; or
> (8) You do not wish to do a particular type of work.

Moreover, the determination that a claimant is "unable to work" is an issue reserved to the Commissioner. 20 CFR § 404.1527(e) provides:

> (e) *Medical source opinions on issues reserved to the Commissioner.* Opinions on some issues,

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.

(1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

Social Security Ruling ("SSR") 96-5p provides, in pertinent part:

Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. In addition,

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

> they sometimes offer opinions in other work-
> related terms; for example, about an
> individual's ability to do past relevant work
> or any other type of work. Because these are
> administrative findings that may determine
> whether an individual is disabled, they are
> reserved to the Commissioner. Such opinions on
> these issues must not be disregarded. However,
> even when offered by a treating source, they
> can never be entitled to controlling weight or
> given special significance.

Further, Dr. Otis offered an opinion regarding Corbett's back

problems and his capacity to work due to physical problems, issues

beyond his expertise as a psychologist, and, therefore, his opinion

is not entitled to significant weight. Most importantly, the

opinions of Dr. Otis and Dr. Mumford were not supported by clinical

evidence and were inconsistent with other substantial evidence

contained in the record.

In addition to Dr. Pearson's well-supported evaluation, the

ALJ considered the State agency reviewing physicians' and

psychologists' opinions. 20 CFR § 404.1527(f)(2)(i) provides:

> Administrative law judges are not bound by any
> findings made by State agency medical or
> psychological consultants, or other program
> physicians or psychologists. However, State
> agency medical or psychological consultants,
> or other program physicians or psychologists,
> are highly qualified physicians and
> psychologists who are also experts in Social
> Security disability evaluations. Therefore,
> administrative law judges must consider

61

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

> findings of State agency medical or
> psychological consultants, or other program
> physicians or psychologists, as opinion
> evidence, except for the ultimate
> determination about whether you are disabled.

As the ALJ determined, the reports from the State agency
reviewing physicians reflect that Corbett had a physical RFC for
light or medium work and the reports of the State agency reviewing
psychologists reflect that Corbett had a mental RFC for simple,
routine work. As noted earlier, Dr. Insinna stated that Corbett's
progress through the Domiciliary Homeless Program and substance
abuse treatment indicated he would be able to engage in and perform
at least simple and routine, basic work. Dr. Insinna noted:

> Mr. Corbett is to be commended for engaging in
> this program lasting almost one year. With
> the idea that he continued his sobriety he
> should be an asset to the community, being
> able to have a productive life.

The ALJ also considered the March 2002 report from Dr.
Anderson, Ph.D. that noted Corbett had only a "history of" PTSD and
no severe mental impairments whatsoever, and also considered the
April 2002 report from Dick Wimmer, Ph.D., who reviewed and
affirmed Dr. Anderson's opinion. The ALJ was not only entitled, but
was required, to consider these expert opinions.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

In <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990), the Fourth Circuit stated that the ALJ bears the ultimate responsibility for weighing the evidence and resolving any conflicts, and that, in reviewing for substantial evidence, the reviewing court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Thus, the Magistrate Judge determined that the record contained evidence supportive of the ALJ's determination that the opinions of Dr. Otis, Dr. Mumford and Mr. Harrison were inconsistent with the substantial evidence of record, and that the ALJ had properly applied the dictate contained in <u>Craig</u> that "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Craig</u>, <u>supra</u>.

The Magistrate Judge concluded that the record contained substantial evidence to support the ALJ's decision to accord greater weight to the opinions of Dr. Pearson and the State agency psychologists than to those of Dr. Otis, Dr. Mumford and Mr. Harrision. The Court agrees.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

### VII. CONCLUSION

Upon examination of Corbett's objections, it appears that he has not raised any issues that were not thoroughly considered by the Magistrate Judge in his report and recommendation. Moreover, the Court, upon an independent <u>de novo</u> consideration of all matters now before it, is of the opinion that the Report and Recommendation accurately reflects the law applicable to the facts and circumstances before the Court in this action. Therefore, it

**ORDERS** that Magistrate Kaull's Report and Recommendation be, accepted in whole and that this civil action be disposed of in accordance with the recommendation of the Magistrate. Accordingly,

1.   the defendant's motion for Summary Judgment (Docket No. 10) is **GRANTED;**

2.   the plaintiff's motion for Summary Judgment (Docket No. 8) is **DENIED;** and

3.   this civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

The Clerk of the Court is directed to transmit copies of this

Order to counsel of record.

DATED: March 24, 2006.


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE